268 F.3d 868 (9th Cir. 2001)
 STEVEN KING AINSWORTH, PETITIONER-APPELLEE-CROSS-APPELLANT,
v.
JEANNE WOODFORD, ACTING WARDEN OF CALIFORNIA STATE PRISON AT SAN QUENTIN, RESPONDENT-APPELLANT-CROSS-APPELLEE.
 Nos. 99-99024, 99-99026
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted July 12, 2001
Filed September 28, 2001
 
 [Copyrighted Material Omitted]
 Quin Denvir, Federal Defender, Sacramento, California, and James S. Thomson, Berkeley, California, for the petitioner.
 J. Robert Jibson, Deputy Attorney General, Sacramento, California, for the respondent.
 Appeal from the United States District Court for the Eastern District of California; Lawrence K. Karlton, Chief District Judge, Presiding. D.C. No. CV-S-90-00329-LKK-PA
 Before: Hug, Graber, and Fletcher, Circuit Judges.
 Opinion by Judge Hug; Dissent by Judge Graber
 Hug, Circuit Judge:
 
 
 1
 Jeanne Woodford, Acting Warden of San Quentin State Prison (the "State"), appeals the district court's order granting California state prisoner Steven Ainsworth's 28 U.S.C. &#167 2254 habeas corpus petition vacating Ainsworth's capital sentence. The district court granted relief on Ainsworth's claim that defense counsel was ineffective for failure to investigate and present mitigation evidence at the penalty phase. The district court denied relief on the remaining penalty phase claims. Ainsworth cross-appeals from the district court's denial of relief on three claims. Because we conclude that Ainsworth's constitutional right to effective assistance of counsel was violated, we do not consider the additional issue raised in the State's appeal or those issues raised in Ainsworth's cross-appeal as all four issues relate to the penalty phase trial and there is no indication those issues would arise again in a new penalty phase trial. Accordingly, we affirm the district court's decision to grant the writ based on counsel's ineffective assistance.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 I. Facts and Guilt Phase Proceedings
 
 2
 On September 12, 1978, Seng "Nancy" Huynh left her home and drove to downtown Sacramento where she was scheduled to work the swing shift at the California Employment Development Department. Shortly after 3:00 p.m. on that day, Ainsworth and Donald Gene Bayles walked onto the public parking lot where Huynh was parking her car. Because Ainsworth did not take the stand, the following narrative is largely based on the testimony of his co-defendant Bayles. As the district court noted, "Bayles shifted all blame for Huynh's death to Ainsworth."
 
 
 3
 Ainsworth shouted "come on, there's one over there," at which point Ainsworth left Bayles and approached Huynh's car. Bayles then heard a "pop" sound. When Bayles approached Huynh's car he discovered Ainsworth sitting in the driver's seat with Huynh sitting beside him. Bayles got into the front passenger's seat next to Huynh and Ainsworth drove the car out of the parking lot.
 
 
 4
 Ainsworth had shot Huynh in the left hip with a .45 caliber handgun. The bullet passed through Huynh's pelvis and lodged against her right hip. During the next twenty-four hours, Bayles testified that he and Ainsworth confined Huynh to the car while they drove around using money from Huynh's purse to purchase beer and gasoline. The two men ignored Huynh's repeated pleas for help. At one point, Bayles put Huynh in the trunk of the car because the men were tired of hearing Huynh moan and cry. Later the men removed Huynh from the trunk and placed her in the back seat of the car. Bayles testified that Ainsworth raped Huynh. (The California Supreme Court held that it was error to admit testimony concerning the rape, but held that the error was harmless.)[1]
 
 
 5
 Approximately twenty-four hours after being shot, Huynh died in the vehicle. Ainsworth and Bayles dumped her body in a wooded area and drove towards San Francisco. Along the way they picked up a hitchhiker. After dropping the hitch-hiker off in downtown San Francisco, Ainsworth and Bayles abandoned the car and went their separate ways.
 
 
 6
 Two days after Huynh's disappearance, police discovered her car in Pacifica, California, less than one mile from Ainsworth's residence. Inside the vehicle, police found a .45 caliber shell casing. Human blood was found on the rear seat cushions and on paper bags in the trunk. Several items found in and near the car had Ainsworth's and Bayles's fingerprints on them.
 
 
 7
 On the morning of September 16, 1978, police discovered Huynh's purse and brassiere on the ground at an interchange area off Interstate 5. In the purse, police found a time card bearing Huynh's signature and Bayles's fingerprints. On January 20, 1979, nearly four months after Huynh's disappearance, police arrested Bayles. Bayles led authorities to a clearing approximately seven miles south of Elk Creek, California. There police found Huynh's body behind a log, covered by a 55-gallon drum. The body was in an advanced state of decomposition.
 
 
 8
 Police arrested Ainsworth in May of 1979. Ainsworth and Bayles were charged with first degree murder with two special circumstances, kidnapping and robbery. The State tried the defendants jointly. Ainsworth did not take the stand.
 
 
 9
 On January 2, 1980, Ainsworth was found guilty of first degree murder. The jury also found to be true the special circumstances allegations of robbery and kidnapping. Bayles was found guilty of second degree murder.
 
 II. Penalty Phase Proceedings
 A. Prosecution's Case
 
 10
 The penalty phase commenced on January 4, 1980. The prosecution entered a stipulation that Ainsworth had twice been convicted of armed robbery. The prosecution then introduced two unadjudicated criminal acts committed by Ainsworth: a 1978 armed robbery of a San Mateo market and a 1979 assault and robbery of an individual in San Francisco.
 
 
 11
 The prosecution presented the testimony of three individuals. The first, Jay Campagna, testified that two days after the murder of Huynh, Ainsworth held him up at gunpoint in a California convenience store where Campagna was employed. Ainsworth took $200 from the store's cash register.
 
 
 12
 The prosecution's second witness, Robert Holley, testified regarding an incident that occurred on April 29, 1979, just four days before Ainsworth was arrested in connection with the murder of Huynh. On that day, Holley and Ainsworth consumed several beers together at Holley's home. Ainsworth then struck Holley on the head from behind and strangled him until Holley lost consciousness. When Holley awoke, he discovered that Ainsworth and his wife had removed some of Holley's belongings from the apartment, including his watch, guitar, stereo speakers, wallet, keys and laundry money.
 
 
 13
 Finally, the State called Dennis Ribble who testified that approximately one week after Huynh was shot, Ainsworth declined Ribble's offer to purchase Ainsworth's gun. Ribble testified that Ainsworth told him the gun "was hot" and that he "had shot a man in Sacramento" with the gun while robbing a liquor store. Ribble also testified that Ainsworth told him he carried the man's body around in his car for three days.
 
 B. Defense Case
 
 14
 After waiving his opening statement, Ainsworth's court-appointed counsel called four witnesses. The direct testimony of these four witnesses, including Ainsworth's counsel's questions, occupies a total of just under nine transcript pages.
 
 
 15
 First, the defense called Sherry Donsing, Ainsworth's sixteen-year-old niece. Donsing testified that she had visited her uncle in San Francisco on several occasions and she felt very safe with him. She testified that her uncle was a talented painter and would help her paint and draw. She recalled fishing and taking trips to the mountain with her uncle. She further testified that Ainsworth treated animals very kindly. Finally, she stated that she had never seen Ainsworth hurt anyone or carry a gun.
 
 
 16
 Next, the defense called Ainsworth's sister, Carol Donsing, who testified that their father had committed suicide sixteen years prior. She also testified that she never saw Ainsworth carry a gun, that Ainsworth was of "very fair " intelligence, and that he had completed high school and attended some college. In addition, Donsing testified that Ainsworth was married and had a three-month old son.
 
 
 17
 The defense then called Hazel Deacon, Ainsworth's former girlfriend. Deacon had known Ainsworth for eight years and had lived with him from 1977 to 1978. She testified that while they lived together Ainsworth held a full-time job and never "brutalized" her or anyone else in her presence. Deacon stated that she felt safe with Ainsworth when she was with him. Deacon recalled an auto accident that occurred near their home; Ainsworth stayed with an injured girl until the fire department arrived. However, after being asked by defense counsel if she had ever seen Ainsworth with a gun, Deacon answered in the affirmative. On the cross examination only made possible by defense counsel's question and Deacon's answer, the prosecutor asked, "What did he tell you he was going to do with that firearm?" Deacon answered,"He said he was planning on robbing a bank, only there was too many police around."
 
 
 18
 As its final witness, the defense called Colleen Yoho, Ainsworth's employer and landlord from 1978 to 1979. Yoho testified that Ainsworth had performed carpentry and maintenance work for her and her husband and that he was a good worker. She testified that she had never seen Ainsworth with a gun or engaged in violent behavior. She also stated that she felt in no way threatened by him during the six or seven months she knew him.
 
 
 19
 Counsel for the prosecution and defense then presented closing arguments. On January 8, 1980, the jury returned a verdict, finding the penalty to be death. Ainsworth was sentenced to death on January 30, 1980.
 
 III. Post Trial Proceedings
 
 20
 The California Supreme Court affirmed Ainsworth's conviction and sentence. See People v. Ainsworth , 45 Cal. 3d 984, 248 Cal. Rptr. 568, 755 P.2d 1017 (1988). The United States Supreme Court denied certiorari. See Ainsworth v. California, 488 U.S. 1050 (1989). After exhausting his available state court remedies, Ainsworth filed a 28 U.S.C.&#167 2254 habeas petition in federal district court. The district court granted Ainsworth's petition on the ground that defense counsel was ineffective at the guilt phase for failing to interview a pathologist and obtain additional testimony regarding Huynh's cause of death.
 
 
 21
 On appeal, this court reversed this holding on the guilt phase. See Ainsworth v. Calderon, 138 F.3d 787 (9th Cir. 1998). The opinion was later amended with instructions to the district court to resolve Ainsworth's penalty phase claims on remand. See Ainsworth v. Calderon, 152 F.3d 1223 (9th Cir. 1998).
 
 
 22
 In an order filed September 2, 1999, the district court granted Ainsworth's habeas petition and vacated his death sentence. On September 10, 1999, the State timely filed a notice of appeal. Ainsworth cross-appealed.
 
 
 23
 Ainsworth sought a certificate of probable cause (CPC) which the district court granted. On May 11, 2001, we granted a certificate of appealability (COA) as to all three issues raised in Ainsworth's cross-appeal consistent with Slack v. McDaniel, 529 U.S. 473 (2000) (habeas appeal commenced after passage of Antiterrorism and Effective Death Penalty Act of 1996 requires COA even if petition filed prior to Act's effective date).
 
 STANDARD OF REVIEW
 
 24
 We review de novo a district court's decision to grant or deny habeas corpus relief. See Ainsworth, 138 F.3d at 790. Any underlying state court conclusions of law are also reviewed de novo. See id. Factual findings made by the district court in reaching its decision are examined for clear error, while state court findings of fact are given deference unless based on an unreasonable determination of the facts in light of the evidence presented. See id.
 
 DISCUSSION
 
 25
 I. Ineffective Assistance of Counsel at Penalty Phase
 
 
 26
 The State contends that the district court erred when it concluded that Ainsworth established ineffective assistance of counsel at the sentencing phase of trial. We must evaluate a claim of ineffective assistance of counsel under the two-part test announced in Strickland v. Washington, 466 U.S. 668 (1984).
 
 A. Deficient Performance
 
 27
 We must first determine whether during the penalty phase of the trial counsel's performance was deficient. See id. at 687. It must be shown that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. We must decide whether under "prevailing professional norms, " counsel's "assistance was reasonable considering all the circumstances." Id. at 688.
 
 
 28
 Because of the difficulties inherent in assessing whether counsel's performance was reasonable, the Supreme Court has warned that "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. In assessing counsel's performance, we must make every effort "to eliminate the distorting effects of hindsight." Id.
 
 
 29
 Even viewing counsel's performance with the deferential scrutiny required by the Supreme Court, we find that counsel's representation fell below an objective standard of reasonableness. See id. at 688. As we have noted, "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999) (quoting Caro v. Calderon, 165 F.3d 1223 (9th Cir. 1999)). In the instant case, counsel failed to adequately investigate, develop, and present mitigating evidence to the jury even though the issue before the jury was whether Ainsworth would live or die. A reasonable investigation would have uncovered a substantial amount of readily available mitigating evidence that could have been presented to the jury. Instead, the jurors as in Wallace, "saw only glimmers of [the defendant's] history, and received no evidence about its significance vis-a-vis mitigating circumstances." Id . at 1116.
 
 
 30
 It is difficult to imagine, nor could counsel provide at his deposition, a tactical reason for failing to investigate and present the substantial mitigating evidence available. See Clabourne v. Lewis, 64 F.3d 1373, 1385 (9th Cir. 1995) (finding counsel ineffective where there was no tactical reason for counsel's failure to investigate and present available mitigating evidence). The record demonstrates that counsel engaged in minimal preparation for the penalty phase proceedings. Defense counsel interviewed one defense witness for only ten minutes on the morning she was scheduled to testify. Even though he obtained Ainsworth's school records, counsel failed to examine Ainsworth's employment records, medical records, prison records, past probation reports, and military records. These important documents were readily available as evidenced by the fact that a probation officer relied on them to complete a probation report prepared immediately after the jury's penalty verdict and prior to formal imposition of the sentence. The probation report documented Ainsworth's troubled childhood, his heroin and morphine use while in the military, and his twenty year addiction to drugs and alcohol. None of these facts were investigated for presentation to the jury.
 
 
 31
 Counsel admitted in a 1991 deposition that he abdicated the investigation of Ainsworth's psychosocial history to one of Ainsworth's female relatives. Counsel neglected to obtain police reports evidencing Ainsworth's prior convictions for armed robbery until the day before the penalty phase commenced, although he was aware for two-and-a-half months that the State would present these convictions as evidence in aggravation. Because of his failure to adequately prepare, counsel moved for a continuance which the court denied.
 
 
 32
 Counsel also failed to present to the jury evidence of Ainsworth's positive adjustment to prison life during his previous incarcerations. While incarcerated Ainsworth completed his high school education and pursued his artistic talents. He received favorable reviews from prison staff and presented no management or custody problems. This evidence would have aided the jury in determining whether Ainsworth would be a danger to other inmates or prison officers if sentenced to life in prison.
 
 
 33
 During the penalty phase proceedings, counsel waived his opening statement. He then proceeded to call four witnesses who testified briefly. In the acerbic, but accurate, words of the prosecutor during closing argument, "What do the Ainsworth witnesses tell us? He's a good artist. He's kind to animals, and he doesn't commit crimes with his family looking."
 
 
 34
 While it is true that the testimony touched upon general areas of mitigation, counsel's cursory examination of the witnesses failed to adduce any substantive evidence in mitigation. In fact, counsel's ill-preparation resulted in the testimony of one defense witness, Hazel Deacon, contributing to the evidence in aggravation. On direct examination, defense counsel asked Deacon whether she had ever seen Ainsworth with a firearm to which the witness replied "yes." This opened the door for the prosecutor to question Deacon about the gun on cross-examination. As a result, Deacon revealed that Ainsworth possessed a firearm near "the very end of September or very beginning of October [1977]" and "plann[ed] on robbing a bank, only there w[ere] too many police around." This blunder could have been avoided with minimal preparation.
 
 
 35
 Counsel refused to question two of the prosecution's three witnesses in aggravation. His cross-examination of the third witness consisted of five questions including whether the witness, Dennis Ribble, wanted to see Ainsworth executed for the crime. His brief closing argument did not reference any of the meager evidence he presented during the penalty phase, did not discuss any mitigating factors about Ainsworth as a person or his troubled background, and did not refute any evidence in aggravation offered by the prosecution. The bulk of counsel's closing was devoted to a general discussion about whether Steven Ainsworth, who "is not a nice person," should be "locked in a cage for the rest of his life or whether he'll be put in a gas chamber." It was essentially an argument against the death penalty in general to a jury that had at voir dire already indicated no opposition to the death penalty.
 
 
 36
 The available mitigating evidence would have provided the jury with insight into Ainsworth's troubled childhood, his history of substance abuse, and his mental and emotional problems. Ainsworth grew up in a household where both his mother and father were volatile alcoholics and alcoholic arguments occurred nightly. His father was physically, verbally, and emotionally abusive to Ainsworth and on at least two occasions attempted to kill the young boy. Ainsworth's father ultimately succeeded in ending his own life on Christmas Day 1963, after four previous suicide attempts. The evidence adduced post-trial indicates that Ainsworth blamed himself for the suicide and felt an overwhelming sense of guilt following his father's death.
 
 
 37
 Ainsworth began ingesting alcohol at age five. At 16, he was made a ward of the court after he ran away from home and engaged in vandalism. Later, after an attempted suicide, Ainsworth was admitted to the psychiatric ward of the County Hospital for treatment of alcoholism. By his junior year in high school, Ainsworth was drinking heavily and was expelled from school for bringing alcohol onto the school premises. Shortly thereafter, at age 17, Ainsworth enlisted in the military. He was later discharged because of his addiction to alcohol and morphine, a diagnosis of antisocial personality, and a civilian forgery charge; the discharge occurred just five months after his father's suicide. Two months later, he was admitted to the Sacramento County Hospital where physicians' diagnosis was that he suffered from acute alcoholic intoxication, psychoneurotic disorder, and depressive reaction.
 
 
 38
 Throughout his adult life, Ainsworth regularly abused alcohol and drugs, including heroin, amphetamines, LSD, marijuana, and peyote. He resorted to gasoline when he was unable to access other drugs. He attempted suicide six or seven times by slashing his wrists. All of this information would have been extremely important to the jury in its effort to decide whether to impose the death penalty or a sentence of life in prison where he adjusted with no problems.
 
 
 39
 It is likely that the introduction of expert testimony would also have been important in the jury's determination. Dr. Sonkin, a psychotherapist and forensic consultant who examined Ainsworth at the request of post-trial counsel, concluded that Ainsworth was "a victim of serious physical and psychological abuse and neglect as a child." Dr. Gretchen White, a clinical psychologist and marriage, family and child counselor who administered several psychological tests to Ainsworth, interviewed him, and reviewed numerous documents relating to his background, concluded that "Mr. Ainsworth's self esteem is very low, and he is beset with negative feelings about himself. He tends to ruminate on such feelings, finding it difficult to push such thoughts behind him. Such feelings often develop into chronic depression and may result in suicide." According to Dr. White, "these negative thoughts about himself are consistent with Mr. Ainsworth's history of suicide attempts, and his family's suicidal history."
 
 
 40
 Finally, Dr. Stephen Pittel, a professor of psychology and forensic consultant who also examined Ainsworth post-trial, found that:
 
 
 41
 Mr. Ainsworth used any mind-altering or mood-altering substance that gave him even the briefest respite from his painful depressive feelings and ruminations. [E]xcept for . . . brief periods of abstinence, and while he was incarcerated, Mr. Ainsworth was under the influence of narcotics or other drugs virtually every day from the time of his release from jail in April, 1964 to the time of his arrest for homicide in May, 1979. Mr. Ainsworth used drugs primarily to ward off persistent feelings of guilt, despair, worthlessness, and suicidal urges associated with a major depressive illness. Mr. Ainsworth used drugs as a form of self-medication because he lacked any other means of overcoming or even coping with his unbearable inner experience. [There are] documented instances of depression, alcoholism, drug addiction, suicide and suicide attempts by no less than 19 of Mr. Ainsworth's ancestors in the past three generations. Mr. Ainsworth's hereditary pre-disposition to depression was exacerbated by his parents' drunkenness, marital discord, and by the verbal and physical abuse, maltreatment, and neglect he suffered at their hands during his formative years. All of [the] crimes . . . committed [by Ainsworth were] while Ainsworth was under the influence of heroin or other opiates, and all of them were motivated by Mr. Ainsworth's need to support a narcotic addiction that required him to spend upwards of $100 a day just to avoid the excruciating pains of withdrawal sickness.
 
 
 42
 The State contends that compiling the mitigating evidence located post-trial required time and money that Ainsworth's trial counsel lacked. However, the information obtained post-trial is the type typically gathered by defense counsel for sentencing and was readily available prior to the penalty proceedings. Counsel admitted at his deposition that he sought no assistance from a law clerk, paralegal, or another attorney in his preparation for the penalty phase, nor did he seek advice or aid from investigators or experts. In addition, he did not seek any state funds to prepare for the penalty phase although funding for the use of investigators and experts in capital cases was available under California Penal Code section 987.9.
 
 
 43
 The State also contends that a less demanding standard of performance existed at the time of Ainsworth's trial. We reject the State's contention. The Supreme Court acknowledged the essential importance of developing the background and character of a defendant in order to make an individualized assessment of the appropriateness of the death penalty in reviewing a case that had been tried in March of 1980. See Penry v. Lynaugh, 492 U.S. 392, 319 (1989). The Court stated:
 
 
 44
 [u]nderlying Lockett and Eddings is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse. Moreover, Eddings makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. Only then can we be sure that the sentencer has treated the defendant as a uniquely individual human bein[g] and has made a reliable determination that death is the appropriate sentence.[2]
 
 
 45
 Id. (internal quotations and citations omitted). With the Supreme Court stressing the importance of the jury being able to consider the background and character of a defendant in order to assure the individualized sentencing required by the Eighth Amendment in a trial conducted in 1980, a fortiori it was the obligation of a defense attorney to present that evidence so the jury could consider it.
 
 
 46
 In Bean v. Calderon, 163 F.3d 1073 (9th Cir. 1998), we rejected a similar argument to the one made by the State. In Bean, we considered an ineffective assistance challenge to a defense during a 1981 capital trial. We explained that "the ineffectiveness at issue . . . did not arise from failure to employ novel or neoteric tactics. Rather, it resulted from inadequacies in rudimentary trial preparation and presentation . . . [for example,] conducting an adequate investigation, and preparing witnesses for trial testimony." Id. at 1080. We stated that these "were not alien concepts in 1981, but were an integral thread in the fabric of constitutionally effective representation." Id.; see also Evans v. Lewis , 855 F.2d 631, 636-37 (9th Cir. 1988) (holding that defense counsel had duty to investigate and present evidence of mental health in 1979 capital sentencing proceeding); Smith v. Stewart , 189 F.3d 1004, 1009-1014 (9th Cir. 1999) (holding that defense counsel had duty to present evidence of defendant's background and mental illness in 1979 capital resentencing hearing).
 
 
 47
 Similarly in the current action, counsel's deficient performance resulted from the failure to prepare and present mitigating evidence, interview witnesses, and investigate available documents and other available information. At the very least, counsel should have investigated and developed the background material and presented the information to the jurors so they could make an informed evaluation as to whether the death penalty should be imposed. This was as crucial in 1980 as it is today in order to assure individualized sentencing and the defendant's right to a fair and reliable capital penalty proceeding.
 
 B. Prejudice
 
 48
 It is not sufficient, however, that counsel's performance was deficient. Instead, it must also be established that "the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. Counsel's errors must have been so serious as to deprive the defendant of a fair trial. Id . There must be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. Id.
 
 
 49
 Defense counsel failed to investigate, develop and present the wealth of evidence available concerning Ainsworth's troubled background and his emotional stability and what led to the development of the person who committed the crime. As the Supreme Court noted, it is "the belief, long held by society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse." Penry, 492 U.S. at 319. The jury was not given the opportunity to consider the disadvantaged background and the emotional and mental problems of the defendant in order to provide the individualized sentence required by the Constitution. Furthermore, defense counsel presented no evidence of Ainsworth's favorable prison record which could be important in deciding whether, if given a life sentence without parole, he would be a danger to other prisoners or prison personnel. All of these considerations"undermine [our] confidence in the outcome" of Ainsworth's penalty phase hearing. Strickland, 466 U.S. at 694. Counsel offered no tactical reason for failing to prepare and present the mitigating evidence and to argue its relevance. Had the jury been able to consider the wealth of mitigating evidence available to the defense counsel with reasonable investigation and preparation, there is a reasonable probability that the jury would have rendered a verdict of life imprisonment without parole.
 
 CONCLUSION
 
 50
 We affirm the judgment of the district court granting the petition based on counsel's ineffective assistance at the penalty phase of the trial. We remand the case to the district court with instructions to grant the petition for a writ of habeas corpus unless the State within a reasonable period of time either grants a new penalty trial or vacates the sentence and imposes a lesser sentence consistent with law.
 
 
 51
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The dissent indicates that this erroneously admitted evidence of the rape is one of the two facts that "stand out beyond all others" in her determination that there was no prejudice even if defense counsel's representation was constitutionally ineffective.
 
 
 [2]
 The two cases referred to were decided in 1978 and 1982 analyzing cases that had been tried years before, Lockett v. Ohio, 438 U.S. 586 (1978) and Eddings v. Oklahoma, 455 U.S. 104 (1982).
 
 
 GRABER, Circuit Judge, dissenting:
 
 52
 I respectfully dissent. A previous panel of this court already has held that Petitioner failed to prove that defense counsel was ineffective at the guilt phase of this trial. Ainsworth v. Calderon, 138 F.3d 787 (9th Cir.), amended by 152 F.3d 1223 (9th Cir. 1998). In my view, the same result should obtain with respect to the penalty phase. Petitioner did not demonstrate that his defense lawyer's performance was constitutionally deficient. Even assuming that it was, Petitioner failed to demonstrate prejudice. See Strickland v. Washington, 466 U.S. 668 (1984) (establishing two-part test for claims of ineffective assistance of counsel). Accordingly, I would reverse.
 
 
 53
 A. Defense Counsel's Performance at the Penalty Phase
 
 
 54
 We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. In particular, we must avoid "the distorting effects of hindsight." Id. The presumption of competence is warranted in this case.
 
 
 55
 First, counsel did engage in preparation. Although memories understandably faded between the time of trial in 1979 and the time of depositions 12 years or more later, it is clear that counsel made some efforts to investigate.[1] Counsel remembered talking with Petitioner's mother and with at least one other potential witness, in addition to the four witnesses whom he did call. He reviewed school records. Petitioner recalled that counsel discussed with him his background and social history.
 
 
 56
 Second, defense counsel affirmatively presented significant mitigating evidence.
 
 
 57
 (1) Petitioner's teen-aged niece testified that she had spent weekends, and whole weeks, visiting Petitioner in San Francisco. They went to the mountains and fished. They painted and drew, and Petitioner helped her develop these skills. Petitioner treated animals kindly. His niece felt entirely safe with him.
 
 
 58
 (2) Petitioner's sister testified that Petitioner was married and had an infant son. She never saw him hurt anyone. She told of his intelligence and explained that he had finished high school and taken college classes. Petitioner's sister also recounted their father's suicide when Petitioner was a very young man.
 
 
 59
 (3) A former girlfriend testified that, in the eight years they had known each other, she never saw him exhibit violence. Indeed, she recalled a particular incident demonstrating Petitioner's kindness. After a little girl had been hit by a car, Petitioner comforted the child and sent for the fire department and the child's mother, staying with the child until fire fighters arrived. The former girlfriend felt safe with Petitioner. In fact, they had lived together for a year, during which he was employed full-time and had discussed marriage.
 
 
 60
 (4) A former landlady testified. She and her husband had met Petitioner several months before. They knew Petitioner as a tenant, as a reliable worker, and as a friend. Petitioner worked part-time for the land-lady, doing maintenance and carpentry. In addition, the two couples socialized. This witness never saw Petitioner with a gun and never observed any violent behavior. She, too, felt safe with him.
 
 
 61
 The foregoing evidence was favorable and humanizing. Even the untoward question posed to the former girlfriend was not wholly problematic, for two reasons. First, the jury already knew that Petitioner was an armed robber, so this testimony would not have been surprising in context. Second, it showed that this woman who knew Petitioner very well maintained a favorable opinion of his character despite the occasional presence of guns in his life. That made her testimony more, not less, credible.
 
 
 62
 Third, in addition to presenting favorable mitigating evidence, defense counsel gave a closing argument. He asked the jury to spare his client's life, pointing out that Petitioner would never be free (and thus would not be a danger to others) if they rejected the death penalty.The majority has demonstrated that a different lawyer might have presented more, different, or better mitigating evidence, but that is not the test. Although defense counsel did not give an ideal presentation, the record does not establish that his performance was constitutionally inadequate.
 
 B. Analysis of Prejudice
 
 63
 Even assuming that counsel's performance was deficient, his imperfections do not undermine my confidence in the outcome of the trial. There is no "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; see also Williams v. Taylor, 529 U.S. 362, 396-97 (2000) (applying Strickland to a penalty phase). That is so for two reasons.
 
 
 64
 First, much of the mitigating evidence on which the majority relies presented a double-edged sword, opening the door to harmful rather than helpful inferences.
 
 
 65
 The majority faults counsel for failing to explore police reports evidencing Petitioner's prior convictions for armed robbery. (Maj. op. at 874.) Counsel did argue on legal grounds that evidence of those convictions was inadmissible. Once those arguments failed (and the majority does not suggest that they should have succeeded), it is difficult to see how details of the robberies could have been more helpful to Petitioner than the bare fact of the convictions, which was the evidence admitted.
 
 
 66
 Next, the majority relies heavily on the absence of detail that was presented to the jury about Petitioner's"troubled childhood." (Maj. op. at 875.) However, the whole picture that emerges from the later-developed proffer is not nearly so dismal as the majority paints it. More accurately, what Petitioner experienced was a largely normal middle-class childhood with alcoholic parents and a troubled Air Force-officer father.[2] The investigator noted the parents' good intentions; although young when Petitioner was born, "they attempted to be good parents at that time." Both Petitioner and his sister acknowledged that"their parents attempted to do a lot for the children in terms of taking them places and giving them material things. " Petitioner's sister stated that, although their parents drank too much, the children "were never neglected." Even when Petitioner began to get into trouble, he received family support; as Petitioner's sister described it, their mother (a homemaker and bookkeeper) tried repeatedly to help Petitioner, paying his fines and getting him out of jail. Significantly, too, Petitioner's "troubled childhood " did not stand in the way of his obtaining an education, working productively, and developing artistic talent when he was motivated to do so.
 
 
 67
 The majority cites Petitioner's military record as more evidence that counsel should have introduced. (Maj. op. at 875.) Is evidence of drug thefts, absences without leave, a psychiatric evaluation of "Antisocial Personality," courts martial, and an undesirable discharge (following a civilian conviction for forgery) mitigating? Reasonable minds can differ, but I can see no prejudice from the absence of Petitioner's military record.
 
 
 68
 Lastly, the majority asserts that expert opinions regarding substance and other abuse could have turned the tide. (Maj. op. at 875-77.) However, the full record contains other evidence that casts doubt on the credibility of these experts' views. I already have alluded to a different assessment of the conditions of Petitioner's childhood. Moreover, when being released from prison shortly before committing the murder in this case, Petitioner was described as being "mature," possessing "superior" intelligence, and having the skills to get along "well " with his family, to obtain work, and to "cope with problems of stress and drug usage." In other words, these observations cast doubt on the experts' views that he was or is unable to overcome the consequences of substance abuse and a difficult childhood.
 
 
 69
 Importantly, Petitioner never argued that he was under the influence of alcohol or drugs when he committed the murder. Instead, his defense was that he did not do it. Therefore, in the context of this trial, any evidence of substance abuse could not have mitigated the circumstances of the crime itself. For the evidence to be mitigating in this case, it would have had to persuade the jury to spare Petitioner's life merely because of his substance abuse.
 
 
 70
 That brings me to the second reason why I believe there is no reasonable doubt that the jury would have come to the same result, even with this evidence. The additional mitigating evidence does not show prejudice because the murder itself was exceptionally cruel. Of course, every death-penalty case involves terrible facts, but juries can and do consider just how terrible the facts are when weighing the mitigating evidence.
 
 
 71
 For me, two facts stand out beyond all others. The first is what Petitioner said when he decided that the victim must die. During the 24 hours during which the victim whimpered and begged for help and mercy while she slowly bled to death, Petitioner's accomplice urged him to take her for medical care or leave her where someone else might find her. Petitioner calculatedly refused because, he said, he had been in prison for robberies and did not want to go back. The second chilling fact is what Petitioner said when he decided to remove the victim's sanitary napkin and rape her while she was dying: "Okay, you bitch, now is it."[3] In view of her injuries, a pathologist testified, the rape would have caused excruciating pain. These and other aspects of the crime were fresh in the minds of the jurors. I am confident that they would have been unmoved by an argument that Petitioner was a drug abuser.
 
 C. Conclusion
 
 72
 The performance of defense counsel at the penalty phase of the trial in 1979 was, although not perfect, within the range of competent representation. Even if it was not, Petitioner suffered no actual prejudice as a result of counsel's deficiencies. For those reasons, I would reverse the judgment of the district court, and I dissent from the majority's contrary holding.
 
 
 
 Notes:
 
 
 [1]
 Lack of recollection of details 12 or more years after the events in question is not, by itself, a reason to distrust counsel or counsel's judgment. Petitioner's memory, too, was quite hazy due to the passage of time. Indeed, when so much time has passed it is even more important to keep in mind the presumption of adequate assistance of counsel.
 
 
 [2]
 The jury was informed that Petitioner's father was troubled; Petitioner's sister testified about their father's suicide. The majority exaggerates even the father's history when it says that "on at least two occasions [he] attempted to kill the young boy." (Maj. op. at 875.) When Petitioner was 13 years old, his father threw large chunks of cement at him, while drunk at a family outing at the beach. Petitioner was not injured. When Petitioner was about 16 years old, he was riding with his father in a truck, and his father tried to roll the truck. Again, he was uninjured. Petitioner did believe that his father was trying to kill him on both occasions, rather than acting out momentary drunkenness or depression, but there is no support for the majority's suggestions that there were other such occasions or that Petitioner was a "young boy" at the time.
 
 
 [3]
 The majority suggests that it is inappropriate to rely on Bayles' testimony about the rape. (Maj. op. at 870-71.) However, the very reason why the California Supreme Court held that the trial judge's error was harmless was that there was unrebutted physical evidence corroborating Bayles' account of the rape. People v. Ainsworth, 755 P.2d 1017, 1031-32 (1988). The corroborating physical evidence included: the victim's bra was found miles from her body; the body was naked from the waist down; and the victim's car, which also was distant from the location where the body was dumped, contained a used sanitary napkin. Moreover, the California Supreme Court's reason for holding that the trial court erred was technical: Although the trial judge would have considered the relative prejudice and probative value of the testimony in response to defense counsel's objection on that ground, the judge had not made a record detailing that balancing. Id. at 1031. Nothing in the court's opinion suggests that Bayles' testimony was inaccurate, contradicted, or otherwise inadmissible.