# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 9, 2017          Decided August 8, 2017

No. 15-3032

UNITED STATES OF AMERICA,
APPELLEE

v.

BRANDON LAUREYS,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cr-00106-1)

*S. Rebecca Brodey*, appointed by the court, argued the cause for appellant. With her on the briefs was *L. Barrett Boss*, appointed by the court.

*James A. Ewing*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief was *Elizabeth Trosman*, Assistant U.S. Attorney. *Suzanne G. Curt*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS, TATEL and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Brandon Laureys was convicted by

a jury of attempted coercion and enticement of a minor and travel with intent to engage in illicit sexual conduct, arising from an online encounter with an undercover detective with whom Laureys enthusiastically envisioned sexual encounters with a nine year-old girl. This court rejected Laureys' challenge to his convictions on the ground that there was insufficient evidence of intent but remanded his claim of ineffective assistance of counsel to the district court. *United States v. Laureys*, 653 F.3d 27, 35 (D.C. Cir. 2011). Laureys now appeals the denial of that claim. Because we conclude that trial counsel's failure to obtain expert mental health testimony was constitutionally deficient, we reverse the judgment of conviction and remand for a new trial.

## I.

The evidence underlying Laureys' convictions is set forth in *Laureys*, 653 F.3d at 29–31. That evidence, and the evidence presented on remand, is summarized here as relevant to trial counsel's attempt to obtain an expert mental health witness.

## A.

Briefly, the evidence at trial showed that on November 14, 2008, Laureys initiated an online chat with "DaughterLover_Maryland," a user of the website IncestTaboo.com who introduced himself as a 38 year-old man named "Jim." In reality, "Jim" was D.C. Metropolitan Police Detective Timothy Palchak. After some discussion of their predilection for young girls, Palchak told Laureys he had a sexual relationship with his girlfriend's nine year-old daughter. Laureys expressed interest in joining them both for sex ("you gotta invite me over . . . let me help with the little girl . . . train the little gir[l, man] . . . make her into a good little whore"). Chat Transcript at 2.

Palchak asked Laureys how close he was to D.C., and Laureys responded that he was "real close" and could come to "hang out and perv out together." *Id.* In response to Palchak's stated desire to be safe "before we play," Laureys suggested "let her meet me and everything first . . . make sure she wants to do it haha . . . could start with just letting me watch her an[d you] . . . til she feels more comfortable." *Id.* at 2–3. Palchak offered to "get a beer first to make su[re we] are comfortable then have fun at my place," *id.* at 4, but Laureys instead suggested meeting at a park as it would be cheaper. Palchak then emailed Laureys a picture of a young girl, to which Laureys responded "you fucking NEED to let me hang out with her man," *id.* at 5. After exchanging information about their physical characteristics, Laureys warned that he could not stay long because his girlfriend was coming into town.

Palchak and Laureys thereafter communicated twice by phone, and according to Palchak, they again exchanged information about their own physical characteristics and Laureys described the car he would be driving. When that car arrived at Palchak's location, Laureys was arrested and later indicted for one count of attempted coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b), and one count of travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b).

**B.**

In June 2009, Laureys' trial counsel contacted Dr. Fred Berlin, a specialist in sexual disorders at Johns Hopkins University School of Medicine, about potentially serving as an expert witness at Laureys' trial. In a letter of July 7, 2009, to the trial judge seeking court funding for Dr. Berlin's services, trial counsel hinted at what would become the basis of Laureys' defense at trial — that Laureys was merely fantasizing about sex with the minor in his chat and wanted to meet with Palchak to

continue fantasizing offline, stating that "[t]he basic question we are addressing [with Dr. Berlin] is the actual (subjective) intent of my client when he engaged in on-line dialogue and subsequently traveled to the District from Maryland . . . ." Soon after, trial counsel conducted online research into sexual compulsion, internet addiction, and chat room deviance. In subsequent queries to other potential experts, trial counsel raised the possibility of a diminished capacity defense based on Laureys' purported inability to form the specific intent to entice a child because he suffered from "cybersex addiction." This diminished capacity defense would differ from the fantasy defense in one key aspect, because the latter posited that Laureys lacked the requisite intent while the former posited that his cybersex addiction and sexual compulsivity prevented him from forming the requisite intent.

After two potential expert witnesses either declined to participate or failed to respond, trial counsel focused exclusively on Dr. Berlin and his ability to support the diminished capacity defense, despite having no sense of what Dr. Berlin's ultimate diagnosis of Laureys might be. Communication between trial counsel and Dr. Berlin was sparse. For instance, a month after Dr. Berlin examined Laureys at the D.C. Central Detention Facility, trial counsel notified Dr. Berlin that trial was scheduled to start in less than two weeks, despite his having known of that schedule for more than a month prior to the examination. Dr. Berlin's office responded that he would be unprepared to testify so soon. Trial counsel sent additional background material to Dr. Berlin the following day, but Dr. Berlin's office responded to ask whether a continuance had been granted because otherwise Dr. Berlin would not keep working on the case. Trial counsel responded "2/16/10 more later..." but Dr. Berlin's office would eventually claim not to have received this email.

At an October 29, 2009, status conference at which Laureys' trial was continued until February, the trial judge expressed significant doubts about the diminished capacity defense envisioned by trial counsel.  Suggesting that the defense was more relevant to sentencing than guilt or innocence, the judge offered a rather ominous warning that he had seen many cases in which a defense was prepared only to be abandoned at the last moment, leaving no defense at all.  Trial counsel acknowledged uncertainty about whether Dr. Berlin might ultimately be helpful to his client, but he said his own "focus has been on exploring the issue of sexual compulsivity and Internet addiction" and how that might negate a showing of specific intent.  10/29/09 Tr. 6:1–19; *see also id.* at 3:10–13.

Trial counsel's next contact with Dr. Berlin was three months later, when he advised by email in January 2010 that trial was scheduled to begin in two weeks and was unlikely to be continued.  Dr. Berlin's office responded that he could not possibly testify in February, having not previously been informed of the earlier continuance, and due to his having not received requested background material, Dr. Berlin had not been able to come to any conclusions about Laureys.  When so informed, the trial judge again questioned whether trial counsel was "chasing the will of the wisp" with this strategy, 2/1/10 Tr. 3:25, but again continued trial.  At that hearing, trial counsel indicated that a trial would occur with or without Dr. Berlin, because Laureys would still testify about his own mental state, but Dr. Berlin's testimony would make the defense that much stronger.

At a February 22, 2010, status conference, trial counsel sought a new trial date that would allow Dr. Berlin sufficient time to conclude his analysis.  Dr. Berlin refused to offer a preliminary medical opinion about Laureys in time for the status conference, explaining that professional ethics forbade him from

6

formulating any opinion about Laureys' mental condition before he had a chance to review all of Laureys' records. Yet trial counsel expressed his own hope that Dr. Berlin would testify that "Laureys would be incapable of formulating the specific intent to do the acts which he's alleged to have done; that he's an Internet sexual compulsive and that he doesn't have a yes/no mechanism." 2/22/10 Tr. 3:25–4:24. For a third time, the trial judge expressed concern to trial counsel that Dr. Berlin "is not going to give you the result you want," *id.* at 9:22–24, but trial counsel insisted that the "Internet sexual compulsive" diagnosis exists, speculating that Dr. Berlin would offer a helpful opinion along those lines, *id.* at 11:1–23. Trial was then set for May 25, 2010.

One week later, trial counsel informed Dr. Berlin of the new trial date, as well as an expert report deadline of April 7, 2010. On March 15, 2010, Dr. Berlin responded that given his other commitments he could not review the voluminous materials in time to prepare an opinion for Laureys' trial. At an April 7, 2010, status conference, the trial judge stated that he would continue trial until August 2010 if Dr. Berlin provided something in writing to confirm that "Internet sexual compulsive" is a recognized disorder, regardless of whether Dr. Berlin ultimately concluded that Laureys fit that diagnosis. 4/7/10 Tr. 2:16–4:6. Trial counsel advised Dr. Berlin of the judge's requirement by letter of same day, laying out the diminished capacity defense that trial counsel "believe[d] we are working towards" — Laureys suffers from "a sexual compulsivity disorder either triggered or aggravated by internet addiction, compromised impulse control, bi-polar disorder, or whatever appropriate medical terminology would describe such a mental state." In that letter trial counsel also informed Dr. Berlin that the trial judge was "dubious of [the] ultimate legal value [of the planned diminished capacity defense] in the trial setting." Dr. Berlin responded on April 12 that he agreed with

the trial judge's doubts because it was very unlikely that a successful mental health defense existed in Laureys' case, and that with enough preparation time, Dr. Berlin might be able to offer useful information at a sentencing hearing.

The week before trial, trial counsel made a last-ditch attempt to secure a different psychiatric expert, Dr. Neil Blumberg, who advised he would be unable to offer any professional assistance, and in May 2010, Laureys proceeded to trial without any expert witness.  Abandoning the diminished capacity defense altogether, trial counsel instead focused on establishing that Laureys was merely engaging in fantasy with Detective Palchak.  The testimony offered by Laureys himself in support of this fantasy defense was "disturbing and graphic," *Laureys*, 653 F.3d at 37 (Henderson, J., concurring in part and dissenting in part), and Laureys now agrees that it constituted the most damning evidence against him, *see* Appellant Br. 28–29.  Despite some indication that the nine year-old girl would not be present at the encounter with Palchak — leading the trial judge to suggest his own reasonable doubt as to the travel count under Section 2423(b) — the jury found Laureys guilty on both counts, and he was sentenced to twenty years' imprisonment.

## C.

On remand following Laureys' unsuccessful initial appeal of his convictions, Dr. Berlin testified to his belief that trial counsel wanted him to come to a particular diagnosis, as reflected in both trial counsel's correspondence and statements to the trial judge, that Laureys lacked the capacity to form the specific intent to entice a minor due to some combination of sexual compulsivity disorder, internet addiction, bipolar disorder, or lack of impulse control.  He also testified that although he could not testify to Laureys' inability to form specific intent, he could have provided information for the jury

about the prevalence of fantasy in internet chat rooms, how the internet facilitates sexual behaviors for vulnerable persons, Laureys' mental health issues and how they affect his behavior, and the meaning of certain internet slang terms used to describe sexual activity. In particular, Dr. Berlin observed that online fantasizing can seem very real, but a layperson would not necessarily know that, and that a person could be aroused by talking about child sex without then proceeding to seek sex with children.

Dr. Berlin also rebutted certain quasi-expert assertions made at trial by Detective Palchak, such as that there are only three categories of chat participants who engage in child-sex fantasy: (1) those who masturbate while chatting online, (2) those who want to go offline for phone sex, and (3) those who actually want to meet and engage in sex with a child. If those three categories were exhaustive, Laureys would fall into the third, because he left his house and drove to the District of Columbia for a sexual encounter. But Dr. Berlin would have testified that Palchak's list of categories was not exhaustive, and that significant numbers of chat participants are interested in meeting one another to have adult sex while fantasizing about children. And, whereas Palchak testified that people interested only in fantasy chat will reveal that right up front, Dr. Berlin would have testified that, in fact, it can be very difficult to distinguish chats in which adults are arranging for sex with children from chats in which adults are arranging to meet one another and pretending that a child will join them. Finally, Dr. Berlin testified that Laureys' history of promiscuity with adult men, as well as a series of Laureys' prior chat transcripts in which a discussion of child sex was followed by an invitation to meet the other adult male participant, led Dr. Berlin to conclude there was a high likelihood that Laureys was interested in having sex with Palchak while fantasizing about children. All of that testimony would have bolstered Laureys' testimony that he

sought to meet with Palchak to "engage in homosexual activity while indulging in [taboo] fantasies." 5/26/10 Tr. 302:5–11.

Trial counsel testified that he always believed a mental health expert was necessary to Laureys' defense, but claimed that he did not seek any particular diagnosis or conclusion from Dr. Berlin or intend to limit his potential testimony in any way. Counsel acknowledged that many of the mental health topics addressed at trial by Laureys' own testimony would have been better addressed by an expert witness.

The district court denied Laureys' claim of ineffective assistance, concluding that "any 'failure' to obtain Dr. Berlin's testimony as to Laureys' mental condition was not for lack of effort . . . , but rather was due to a combination of mutual misunderstandings and Dr. Berlin's exceptionally busy schedule." *United States v. Laureys*, 103 F. Supp. 3d 69, 75 (D.D.C. 2015).[1]  The district court rejected Laureys' argument that trial counsel unreasonably failed to secure a substitute expert in Dr. Berlin's place because Dr. Berlin left trial counsel with little opportunity after declining to participate only seven weeks before trial, and, in any event, trial counsel did make an unsuccessful attempt to secure a substitute a week before trial. *Id.* at 77 & n.7.  Finally, the district court concluded that Laureys also failed to establish prejudice resulting from the lack of a mental health expert, pointing to a lack of evidence that Laureys would have declined to testify if Dr. Berlin had done so instead. *Id.* at 77.  Laureys appeals.

---

[1]  The trial judge had retired by this time, and another district court judge was assigned to Laureys' case.

## II.

To establish a denial of effective assistance of counsel, Laureys had to show both that trial counsel's performance "fell below an objective standard of reasonableness" and thus "was not within the range of competence demanded of attorneys in criminal cases," *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984) (internal quotation marks omitted); and that he suffered prejudice because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. This court reviews *de novo* the district court's determination that Laureys was not denied his Sixth Amendment right to the effective assistance of counsel. *United States v. Abney*, 812 F.3d 1079, 1086–87 (D.C. Cir. 2016) (discussing, *inter alia*, *Strickland*, 466 U.S. at 698–700; *Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014); *United States v. Rodriguez*, 676 F.3d 183, 189–92 (D.C. Cir. 2012), and the decisions of our sister circuits). The district court's factual findings are reviewed for clear error. *Payne*, 760 F.3d at 13.

### A.

"[P]sychiatry has come to play [a pivotal role] in criminal proceedings," such that in cases turning on the defendant's mental state, "the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." *Ake v. Oklahoma*, 470 U.S. 68, 79–80 (1985). Congress has similarly provided that indigent defendants are entitled to the assistance of a mental health expert if "necessary for adequate representation." *See* 18 U.S.C. § 3006A(e). Unsurprisingly then, courts have found ineffective assistance arising from counsel's failure to offer expert mental health testimony where it was necessary to an adequate defense. *See, e.g.*, *Gray v. Branker*, 529 F.3d 220, 229–32 (4th Cir. 2008); *Dando v. Yukins*, 461 F.3d 791, 798–800 & n.3 (6th Cir. 2006); *Ainsworth*

*v. Woodford*, 268 F.3d 868, 875–76 (9th Cir. 2001); *Mauldin v. Wainwright*, 723 F.2d 799, 800–01 (11th Cir. 1984).

Here, trial counsel recognized from his very first meeting with Laureys that a mental health expert would be necessary to his defense, and rightly so. Laureys has steadfastly maintained his innocence, despite the existence of a chat transcript in which he discussed child sex in graphic detail, because he insists that he was only engaging in fantasy and that his actual intent was to engage in an adult sexual encounter while fantasizing about a child. Such a defense might seem unimaginable to the average juror absent a clinical presentation regarding, for instance, the prevalence of fantasy in internet chat rooms, or the use of fantasy chat as a coping mechanism to deal with inappropriate or unlawful sexual urges. Therefore, with trial counsel having correctly identified the need for a mental health expert, the question is whether his failure to provide that expert at trial "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 687–88.

The district court held it did not because, due to a combination of mutual misunderstandings and Dr. Berlin's busy schedule, Dr. Berlin was simply unavailable to testify. *Laureys*, 103 F. Supp. 3d at 75; *see also Laureys*, 653 F.3d at 36 (Henderson, J., concurring in part and dissenting in part). Given the trial judge's willingness to accommodate Dr. Berlin's schedule, however, the finding that Dr. Berlin was unavailable was clearly erroneous. The trial judge made clear that he was prepared to once again continue Laureys' trial if Dr. Berlin would submit a written statement confirming that "Internet sexual compulsive" is a recognized psychiatric diagnosis, regardless whether Dr. Berlin ultimately determined Laureys fit that diagnosis. Dr. Berlin declined to do so, informing trial counsel by letter of April 12, 2010, that there was likely not a viable mental health defense for Laureys *even with enough time*

*to prepare for trial*. Timing or lack of preparation was not the deal breaker for Dr. Berlin, but rather his own doubt that he could provide what trial counsel was seeking.

The record amply demonstrates that what trial counsel was seeking was an internet compulsivity diagnosis that trial counsel had arrived at through his own online research, which would support a defense of diminished capacity. As Laureys contends, and as Dr. Berlin testified on remand, trial counsel led Dr. Berlin to believe that counsel was interested in establishing only this diminished capacity defense. When Dr. Berlin did not "come . . . to the conclusion that the trial counsel had hoped [he] would come to," 12/16/14 Tr. 13:11–13, Dr. Berlin bowed out of the proceeding altogether, leaving Laureys without the benefit of the clinical testimony that Dr. Berlin could have offered, which, as trial counsel acknowledged on remand, would have informed the jury's assessment of the fantasy-only defense and helped buttress Laureys' own testimony. The government insists that if there had been a valid diminished capacity defense as envisioned by trial counsel, it would have been "much more powerful than the credibility-based 'fantasy' defense" ultimately relied upon at trial. Appellee Br. 47. Even assuming the government is correct, it somewhat misses the point. Trial counsel focused Dr. Berlin on an *invalid* diminished capacity defense *to the exclusion of all other possible defenses*.

Trial counsel's denial that he directed Dr. Berlin to come to any particular diagnosis or conclusion, instead mentioning diminished capacity as only one possible defense theory, is belied by all of his communications with Dr. Berlin and the trial judge on this topic. Trial counsel implied at one point in his testimony that it was up to Dr. Berlin to come to whatever helpful conclusion he could, inasmuch as Dr. Berlin was more experienced than trial counsel and was familiar with the court process and what lawyers are seeking. From the perspective of

Dr. Berlin and the trial judge, however, trial counsel's communications were far too specific to be understood as seeking any clinical testimony that would benefit his client. Indeed, when afforded the opportunity on remand, trial counsel could point to no evidence that he had sought from Dr. Berlin any such beneficial testimony, rather than testimony on diminished capacity. Even if it was not actually trial counsel's intent to limit Dr. Berlin's inquiry, his single-minded pursuit of a particular diagnosis had the effect of denying his client Dr. Berlin's services.

Furthermore, trial counsel also unreasonably failed to secure a different mental health expert when it became doubtful that Dr. Berlin would testify. Just as trial counsel placed all of his hopes on a particular defense, he placed all of his hopes on obtaining expert testimony from Dr. Berlin, despite Dr. Berlin's continued scheduling conflicts, his persistent refusal to speculate about the requested diminished capacity diagnosis, and the trial judge's repeated skepticism that Dr. Berlin would come through as trial counsel envisioned. In rejecting this part of Laureys' ineffectiveness claim, the district court placed dispositive weight on the fact that Dr. Berlin dropped out only seven weeks before trial, leaving trial counsel little opportunity to replace him. *Laureys*, 103 F. Supp. 3d at 77. But that assumes it was reasonable to rely solely on Dr. Berlin in the first place. Had Dr. Berlin opined, even tentatively, that trial counsel's planned defense could be viable, it might have been reasonable to focus on him to the exclusion of all other experts. Just weeks before trial, however — due to his own apparently exclusive and erroneous focus on expert testimony about Laureys' diminished capacity — trial counsel still had no idea whether Dr. Berlin would be available to testify or what his opinion might turn out to be. In these circumstances, a prudent attorney would at a minimum have sought an alternative source.

Trial counsel acknowledged that he had initially identified another potential expert, Dr. David Greenfield, and even submitted a request for court funding for his expert services, but counsel did not further explore Dr. Greenfield's availability after deciding to rely on Dr. Berlin. Trial counsel did not reach out again to Dr. Greenfield after Dr. Berlin first tentatively and then definitively bowed out, and although he did make an unsuccessful "last stab attempt" to secure Dr. Neil Blumberg a week before trial, 12/16/14 Tr. 141:17–22, nothing in the record suggests that he requested another continuance to allow him to secure a different expert when that failed. Instead, counsel took the case to trial with only Laureys, who suffers from a serious mental illness, left to explain his own intent.

The record does attest to aspects of trial counsel's representation of Laureys that were undeniably conscientious, such as securing court approval for expert witness funding and arranging for Dr. Berlin to interview Laureys at the D.C. Jail. It confirms as well that trial counsel had contacted other potential expert witnesses. This is not a case, then, where trial counsel did not attempt to obtain a mental health expert. Rather, trial counsel's grievously misguided effort to employ a mental health expert in his client's defense was so flawed as to be "the sort of serious blunder that will singlehandedly support a *Strickland* claim." *United States v. Hurt*, 527 F.3d 1347, 1356 (D.C. Cir. 2008). The record shows that in pursuing his own idea of a diminished capacity defense, trial counsel lost sight of how Dr. Berlin could have placed his client's conduct in a clinical context and mitigated the effects of evidence offered by the government and by Laureys himself. Indeed, there was some indication that trial counsel failed altogether to appreciate the benefits of the relevant and appropriate mental health testimony explaining pedophilic fantasy, which could have bolstered Laureys' fantasy defense. *See United States v. Hite*, 769 F.3d 1154, 1170 (D.C. Cir. 2014). On remand, trial counsel

acknowledged that he never asked Dr. Berlin whether he could explain pedophilia to the jury, and he was unable to show that he had asked Dr. Berlin to explain the internet fantasy-chat subculture. Counsel admitted that he had never handled an insanity defense, and yet he appears to have considered himself qualified, as a layperson, to effectively diagnose his client as an "Internet sexual compulsive" and pursue confirmation of a diminished capacity diagnosis with potential experts. Nothing in the record even confirms that "Internet sexual compulsive" is a mental disorder recognized by the American Psychiatric Association.

The government's response that Dr. Berlin's testimony would have "actively *harmed*" Laureys, Appellee Br. 46, not only overlooks how clinical testimony would have provided information to help the jury place Laureys' conduct in context, it ignores altogether how Dr. Berlin could have rebutted Detective Palchak's quasi-expert opinions and effectively limited the harmful effect of much of Laureys' testimony. Trial counsel's failure to secure expert testimony cannot properly be excused as a "reasonable, calculated choice," *but see* Appellee Br. 48 (quoting *United States v. Mohammed*, 693 F.3d 192, 204 (D.C. Cir. 2012)), and even trial counsel did not claim that it was.

In sum, trial counsel's error led to the complete failure to provide expert mental health testimony that trial counsel himself recognized was necessary, thereby depriving Laureys of an adequate defense. This was a slow-moving train wreck, one set in motion long before Dr. Berlin's eventual exit; indeed, it played out as the trial judge had predicted seven months before trial. It was thus unreasonable for trial counsel, so warned, to have done so little to avert it.

**B.**

Turning to prejudice, there is no question that Laureys' defense, and his own testimony, would have been significantly bolstered by expert testimony regarding fantasy chat and, more specifically, the existence of a subculture of men who meet first online and then offline for sex with one another spurred on by child sex fantasies, such that a "reasonable probability" of a different outcome at trial exists. *Strickland*, 466 U.S. at 694.

The court recently determined *Strickland* prejudice was established where trial counsel failed to offer expert psychiatric testimony necessary to establish a duress defense. *United States v. Nwoye*, 824 F.3d 1129, 1139–40 (D.C. Cir. 2016). In particular, expert testimony on the battered woman syndrome would have bolstered the defendant's testimony that she participated in an extortion scheme only at the direction of her abusive boyfriend, especially because a juror might otherwise question why she did not just leave her abuser instead. *Id.* Here, Laureys testified to his own intent in chatting with and traveling to meet Palchak, but without expert assistance, a juror could reasonably conclude that anyone who engaged in such frankly disturbing chat *must* have done so actually intending to have sex with a child. The government labels the notion that people engage in online sexual fantasy as "common knowledge," Appellee Br. 49, but the notion that people engage in graphic, very realistic fantasy about sex with children, both as a means of coping with such urges and as a prelude to adult homosexual encounters, can hardly be considered within the ken of the average juror. As this court has noted, Dr. Berlin's clinical testimony regarding internet sexual fantasy involving children "can shed light on what may be an unfamiliar topic to most jurors." *Hite*, 769 F.3d at 1169–70. And although the jury could still have reasonably concluded that Laureys was not merely fantasizing and planning for adult sex with Palchak, that is a different question than whether a reasonable probability

exists that a jury so informed by expert testimony would have concluded otherwise.  *See Nwoye*, 824 F.3d at 1140.

The lack of a mental health expert also prejudiced Laureys by leaving him unable to rebut dubious, quasi-expert testimony by Detective Palchak.  The jury heard from Detective Palchak that only three categories of chat participants exist: those who only chat online, those who want to then have phone sex, and those who seek to meet in order to have sex with a child.  This would lead the jury to believe that Laureys must have fallen into the third category because it was undisputed that Laureys did seek to meet with Palchak following their online chat.  Dr. Berlin's testimony made clear that Detective Palchak's taxonomy was incomplete, in that another category is known to exist for participants who seek to meet to have an adult sexual encounter with one another.  Similarly, Dr. Berlin could have rebutted Detective Palchak's damaging testimony that "[t]ypically people who are interested in fantasy tell you right up front, I'm into fantasy, not realtime," 5/26/10 Tr. 243:15–16, which suggested to the jury that Laureys must not have been interested in fantasy because he made no such up-front disclaimer.

The government nonetheless maintains that Laureys suffered no prejudice because he would have offered his own lurid, confused testimony regardless of whether a mental health expert also testified.  Appellee Br. 50 n.22; *see also Laureys*, 103 F. Supp. 3d at 77.  Although the record does indicate that, according to trial counsel, Laureys would have testified either way, that is not the relevant question.  Trial counsel conceded that many topics addressed by Laureys' testimony would have been better addressed by Dr. Berlin, such as the existence of an online fantasy subculture, phone sex, deviant sex fantasies, and Laureys' diagnosis of himself as a sex addict.  It is thus reasonable to expect that trial counsel would have limited

Laureys' damaging testimony to the extent Dr. Berlin had already testified on those topics. And even if through effective cross-examination the government were able to draw Laureys out on those topics, Dr. Berlin's detached, clinical perspective would have at least framed Laureys' testimony in a crucial way, allowing the jury to understand Laureys' condition as a doctor would, rather than as the "clearly quite disturbed" defendant understood himself. 12/16/14 Tr. 33:9–11; *see* Appellant Br. 43–44; Reply Br. 11. That difference in perspective might not have been dispositive, but in such a difficult, troubling case in which even the trial judge expressed doubt about Laureys' intent in traveling to D.C., *see also Laureys*, 653 F.3d at 43–44 (Brown, J., dissenting in part), the significance of Dr. Berlin's perspective cannot be underestimated.

Because we conclude that Laureys has met his burden to establish that he was denied his right to the effective assistance of counsel by trial counsel's failure to secure expert mental health testimony, the court has no need to address his additional claims of ineffective assistance. Accordingly, we reverse the judgment of conviction and remand this case for a new trial.