Fernando Eros CARO, Petitioner–Appellee,

v.

Jeanne WOODFORD, Warden, Respondent–Appellant.

No. 00–99013.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 2001.

Filed Feb. 19, 2002.

---

Dane R. Gillette, Senior Assistant Attorney General, Office of the California Attorney General, San Francisco, CA, for the respondent-appellant.

Lynne S. Coffin, State Public Defender, Office of the State Public Defender, San Francisco, CA, for the petitioner-appellee.

Before: PREGERSON, FERGUSON, and KLEINFELD, Circuit Judges.

FERGUSON, Circuit Judge.

A little explanation can go a long way. In this case, it might have made the difference between life and death. But, because trial counsel for Fernando Eros Caro failed to investigate and present evidence

of the impact that exposure to neurotoxicants and child abuse had on his brain, the penalty phase jury was deprived of this critical explanation in determining Caro's culpability for his crime.

This is the second time that this case has come before this panel's consideration. Previously, we held that counsel's nonstrategic failure to investigate Caro's brain damage, despite the known risk of neurotoxicants, constituted deficient performance under *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that a showing of brain damage would demonstrate prejudice to establish his ineffective assistance of counsel claim. We remanded to the District Court to hold an evidentiary hearing to determine whether Caro, in fact, sustained brain damage as a result of his exposure to neurotoxicants and his personal background. The District Court found that Caro had established the existence of brain damage and, therefore, granted his writ of habeas corpus, vacated his death sentence, and ordered a resentencing hearing. The State appeals the Court's decision, and we now affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. CARO'S PERSONAL BACKGROUND

Fernando Eros Caro, the son of poor farm laborers residing in Brawley, California, spent his childhood working and playing in pesticide-soaked fields. The house in which he was raised was surrounded by agricultural fields and did not protect the family from the crop dusters that overflew those fields. The water, which his family used to bathe and cook and clean, was contaminated by pesticides.

Caro's exposure to toxic chemicals continued into adulthood. During high school, he worked as a "flagger" for a crop-dusting company, indicating for the planes where to spray the pesticides onto the fields. He later worked as a maintenance worker at FMC Chemical Corporation ("FMC"), a manufacturer of toxic pesticides. At the plant, Caro responded to chemical spills, repaired the ventilation system, and maintained the mixing and heating equipment. He was regularly exposed to organophosphates, solvents, organochlorines, and carbamates, and he was poisoned by a number of toxic chemicals at the plant.

In addition, Caro has suffered serious physical abuse and head injuries. Caro's family has a multi-generational history of physical abuse, alcoholism, and neglect. Both parents beat Caro throughout his childhood, hitting him with closed fists, sticks, belts, work boots, and tools. His father kicked him with his work boots, struck his head with tools, and once broke his nose. His mother frequently hit him as an infant until he would stop crying. Caro also sustained several head injuries as a child: he was born with a three inch lump on his head due to the use of forceps during his difficult delivery; a water cooler fell on his head at the age of three; and he was hit by a car later that year.

### B. PROCEDURAL HISTORY

On October 16, 1981, Caro was convicted for the murders of Mary Booher and Mark Hatcher, teenage cousins who disappeared while on a bicycle ride and were killed by a close range gunshot to the head. Caro was also convicted of the assaults of Rick Donner and Jack Lucchesi, both of whom survived multiple gun shots inflicted on the same night as the murders.

On December 10, 1981, a second jury returned a verdict of death. The California Supreme Court affirmed. *People v. Caro,* 46 Cal.3d 1035, 251 Cal.Rptr. 757,

761 P.2d 680, 684 (1988). After exhausting his state remedies, Caro filed a 28 U.S.C. § 2254 habeas petition in the United States District Court for the Northern District of California. The District Court denied Caro's request for an evidentiary hearing on his ineffective assistance of counsel claim, granted summary judgment for the State, and dismissed his habeas petition. On appeal, we found that Caro's counsel had failed to investigate and present evidence of brain damage during the penalty phase of the trial and remanded for an evidentiary hearing to determine whether Caro had suffered brain damage as a result of his chronic and acute exposure to neurotoxicants and his personal background. *Caro v. Calderon,* 165 F.3d 1223, 1228 (9th Cir.), *cert. denied,* 527 U.S. 1049, 119 S.Ct. 2414, 144 L.Ed.2d 811 (1999).

On remand, the District Court concluded: "The record before the Court irrefutably establishes that Petitioner suffered brain damage as a result of his exposure to toxic pesticides as well as his personal background." *Caro v. Woodford,* No. C–93–4159–JW, Slip Op. at 16 (N.D.Cal. Aug. 7, 2000). Accordingly, it granted Caro's writ of habeas corpus as to the penalty phase of his trial. This timely appeal followed.

## C. THE EVIDENTIARY HEARING

At the evidentiary hearing, Caro presented the testimony of Dr. Jonathan Pincus, a neurologist; Dr. David Bear, a neuropsychiatrist; and Donald Ecobichon, Ph.D, a toxicologist. Each of these expert witnesses testified that, at the time of his trial, he would have found Caro to suffer from brain damage due to his exposure to neurotoxicants, his personal history, or some combination thereof.

The State presented no witnesses at the hearing, relying instead on the cross-examination of Caro's experts. The State attempted to discredit the experts' conclusions that Caro suffered from brain damage at the time of his trial, pointing out his high marks in school, satisfactory performance in the Marines, negative blood results for pesticides, reasonably high IQ, rationality of actions in covering up the murders, and normal psychiatric and neurological evaluations taken both before and after his trial. Yet, each of the experts testified that none of these facts was inconsistent with a finding of brain damage, especially frontal brain damage. Moreover, Dr. Pincus concluded that it is "highly likely" that the brain damage existed at the time of Caro's trial, based on both a lack of "significant" subsequent injuries and the fact that mixed dominance is indicative of childhood brain damage.

The State also attempted to prove that, at the time of Caro's trial, the medical community did not have the data nor the methods necessary to ascertain whether Caro had suffered brain damage due to his exposure to neurotoxicants and his personal background. However, each of the experts averred that the literature and data available then would have led him to the same conclusion at the time of Caro's trial.

Following the presentation of the evidence, the District Court ruled that the record "*irrefutably*" establishes that Petitioner suffered brain damage as a result of his exposure to toxic pesticides as well as his personal background." *Caro,* Slip Op. at 16 (emphasis added). It reasoned that "three prominent, well-respected witnesses presented by Petitioner universally opined that Petitioner suffers from frontal lobe brain damage caused by head injury, exposure to toxic pesticides and the combination of both factors. Respondent presented no witnesses or evidence to the contrary." *Id.*

## II. DISCUSSION

On appeal, we resolve two issues. First, we hold that the District Court's finding of brain damage resulting from Caro's exposure to neurotoxicants and personal background was not clearly erroneous. Second, we affirm the District Court's order granting relief on the basis that Caro has satisfied the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### A. STANDARD OF REVIEW

The District Court's decision to grant the habeas corpus petition is reviewed de novo. *Paradis v. Arave,* 240 F.3d 1169, 1175 (9th Cir.2001). We review the District Court's factual findings for clear error. *Zichko v. Idaho,* 247 F.3d 1015, 1019 (9th Cir.2001). We must give considerable deference to the District Court's credibility determinations. *Anderson v. Calderon,* 232 F.3d 1053, 1094 (9th Cir.2000).

Whether the facts found by the District Court suffice to establish a claim of ineffective assistance of counsel is a question that we review de novo. *Id.* at 1084. "We may affirm on any ground supported by the record, even if it differs from the rationale of the district court." *Paradis,* 240 F.3d at 1175–76.

### B. DISTRICT COURT FINDING OF BRAIN DAMAGE

 We must first determine whether the District Court's factual finding that Caro suffered brain damage as a result of his exposure to neurotoxicants and his personal background was clearly erroneous. As the testimony of all the experts supported this conclusion, this finding was clearly not in error.

A full review of the testimony confirms that each of the experts testified that Caro suffered from brain damage caused by his exposure to neurotoxicants, his personal background, or some combination thereof. First, Dr. Pincus's conclusion that Caro suffered from organic frontal brain damage followed a clinical assessment, which entailed twenty-five tests and a review of Caro's history.

Dr. Pincus found five indications of abnormality in the frontal lobe of Caro's brain.[1] These included: (1) "mixed dominance" (preference for eye and foot opposite to that of hand preference), (2) a "suck" reflex (abnormal reflex if found in adult), (3) a "snout" reflex (abnormal reflex if found in adult), (4) paratonia (inability to relax limbs), and (5) apraxia (frontal lobe or subcortical dysfunction). Dr. Pincus also found significant, for his diagnosis, Caro's history of pica;[2] head injuries; abuse by his mother and father; poisoning by Clorox; and epileptic-type seizure, which he had as an adult.

Second, Dr. Bear concluded that Caro suffered from both structural and functional brain damage based on: his chronic and acute exposure to cholinesterase inhibitors;[3] his exhibition of many of the autonomic symptoms of such exposure;[4] indi-

---

**1.** Three or more abnormalities are considered to be a reliable indication of brain damage.

**2.** Pica is a symptom of a neurological or psychiatric disorder, which is usually only found in children and is manifested by the ingestion of non-nutritive substances, such as large quantities of dirt.

**3.** Dr. Bear defined "cholinesterase inhibitors" broadly as consisting of two chemical groups engineered to poison the enzyme acetylcholinesterase, and comprising organophosphates and carbamates. These chemicals were originally developed for use as nerve gas in the late 19th Century and during the World Wars, but were later used as pesticides.

**4.** Caro's autonomic symptoms of cholinesterase intoxication included: myosis of the eye,

cators of depression, including suicide threats; memory loss and other disassociative events; his mother's anemia; poverty-stricken childhood; history of physical, sexual, and emotional abuse; and childhood injuries. He also opined that Caro suffered from a genetic abnormality, reflected in his family's history of alcoholism and depression, which interacted with his exposure to neurointoxicants to increase the risk of brain dysfunction.

Finally, Dr. Ecobichon concluded that Caro suffers "persistent CNS [central nervous system] and peripheral damage," due to acute and chronic exposure to neurotoxicants. He cited Caro's early exposure as a child of farm workers, his work as a flagger, and his work at FMC. Dr. Ecobichon also observed that Caro was "the worst case I have ever seen of multiple exposures almost a lifetime, until his incarceration, of exposures to pesticides, from in utero right through infancy to adulthood." He concluded that this exposure would "cause transient and permanent neurological, psychiatric, and behavioral damage." [5]

On cross-examination, the experts did not agree that Caro's reasonably high IQ or satisfactory performance in the Marines contradicted a finding of brain damage, explaining that frontal brain damage may hinder judgment and cause aggressiveness without necessarily diminishing one's intelligence. For example, Dr. Pincus testified that damage to one's frontal lobes may not affect other brain functions controlled by the back of the brain, such as motor skills, sensory perception, memory, and speech.

One's IQ may be unaffected because it only relates to functions controlled by the posterior parts of the brain.

The District Court's acceptance of the unanimous opinion of the experts that Caro suffers from brain damage is not clearly erroneous, considering that he was poisoned by extremely toxic pesticides (some of which are now illegal), suffered multiple head injuries, and exhibited many of the symptoms described by the doctors as consistent with both harmful exposure and resulting brain damage.

■■■ Moreover, we must afford the District Court considerable deference in its determination that the witnesses were qualified to draw such conclusions and that their testimony was credible. *Anderson*, 232 F.3d at 1094. Deference aside, we agree with the District Court that each witness was sufficiently qualified to testify to Caro's brain damage. Dr. Pincus is an expert in neurology and serves as Professor and Chairman Emeritus of Georgetown University Medical Center's Department of Neurology. Dr. Bear is a neuropsychiatrist and Professor of Psychiatry at the University of Massachusetts Medical Center, as well as Director of Psychiatry for Eastern Maine Health Care. Much of his research has focused on the neurological causes of aggression and effects of neurotoxic exposure on the brain. Finally, Dr. Ecobichon is an expert in the field of pesticide toxicology whose knowledge of the effects of pesticides spans four decades.

On the other hand, the State failed to present *any* affirmative evidence, which

---

nausea, diarrhea, frequent and forced urination, constant thirst, and muscle twitching.

5. Dr. Ecobichon testified that acute exposure to certain pesticides, such as organophosphates, affects the central nervous system and causes not only physiological reactions, but

also depression, mental confusion, schizophrenic reactions, and temper outbursts. Moreover, exposure to several types of pesticides multiplies the effects by inhibiting those enzymes in the body that metabolize the chemical and causing much more severe effects.

either controverted the experts' conclusions or discredited their testimony. As such, the District Court's finding was not clearly erroneous. Accordingly, we affirm the District Court's findings adduced from the evidentiary hearing.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

■ The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel. *Strickland,* 466 U.S. at 685, 104 S.Ct. 2052. In determining whether a defendant was afforded his constitutionally-guaranteed effective assistance of counsel, we must analyze all the facts under *Strickland*'s two-prong test. This requires us to determine, first, whether "counsel's performance was deficient" and, second, whether the "deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052.

### 1. Deficient Performance

■ The issue before us is whether Caro's trial counsel rendered ineffective assistance when he failed to investigate and present mitigating evidence of Caro's brain damage. Counsel may be found ineffective if Caro demonstrates that counsel's performance was objectively unreasonable. *Id.* at 688, 104 S.Ct. 2052. What was reasonable under the circumstances must be evaluated as of the time that the legal services were rendered so as to minimize the distortions of hindsight. *Bonin v. Calderon,* 59 F.3d 815, 833 (9th Cir. 1995) (quoting *Campbell v. Wood,* 18 F.3d 662, 673 (9th Cir.1994) (en banc)).

We recently held that "[t]o perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.'" *Mayfield v. Woodford,*

270 F.3d 915, 927 (9th Cir.2001) (en banc) (quoting *Williams v. Taylor,* 529 U.S. 362, 393, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

In *Caro,* we held that counsel's failure to investigate and provide appropriate experts with the information necessary to evaluate Caro's neurological system for mitigation constituted deficient performance under *Strickland. Caro,* 165 F.3d at 1226–27. This is consistent with the recent Supreme Court decision, *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), in which the Court held that counsel's failure to investigate and present evidence of a defendant's mental defect and social history constitutes deficient performance. *Id.* at 396, 120 S.Ct. 1495.

*Caro* is also consistent with this Court's precedent. We have repeatedly held that counsel may render ineffective assistance if he "is on notice that his client may be mentally impaired," yet fails "to investigate his client's mental condition as a mitigating factor in a penalty phase hearing...." *Hendricks v. Calderon,* 70 F.3d 1032, 1043 (9th Cir.1995); *accord Smith v. Stewart,* 241 F.3d 1191, 1199 (9th Cir. 2001); *Smith v. Stewart,* 189 F.3d 1004, 1008–09 (9th Cir.1999), *cert. denied,* 531 U.S. 952, 121 S.Ct. 358, 148 L.Ed.2d 288 (2000).

We have also held that counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health. *Wallace v. Stewart,* 184 F.3d 1112, 1116 (9th Cir.1999), *cert. denied,* 528 U.S. 1105, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000) (counsel has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request[.]"); *Clabourne v. Lewis,* 64 F.3d 1373, 1385 (9th

Cir.1995). This duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation. *Bean v. Calderon,* 163 F.3d 1073, 1079–80 (9th Cir.1998), *cert. denied,* 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999).

■ In this case, counsel was aware of Caro's extraordinary history of exposure to pesticides and toxic chemicals, yet he neither investigated fully this history nor informed the experts who examined Caro of those facts that were known to him. Further, despite counsel's awareness of these facts, he failed to seek out an expert to assess the damage done by this poisoning of Caro's brain. As we emphasized in our earlier opinion, "All counsel had to do was ask the question 'What did all that extraordinary exposure to chemicals do to his brain?' And then, in order to find the answer, he merely had to address the question to either a neurologist or a toxicologist." *Caro,* 165 F.3d at 1228. Such evidence would have provided powerful mitigating evidence at the penalty phase of Caro's trial.

Similarly, counsel failed to present testimony at the penalty phase of trial explaining the effects of the severe physical, emotional, and psychological abuse to which Caro was subjected as a child. We recently found deficient performance when counsel failed to present mitigating evidence of the defendant's troubled childhood and substance abuse. *Ainsworth v. Woodford,* 268 F.3d 868, 875 (9th Cir.2001). We opined that "the introduction of expert testimony would also have been important" to explain the effects that "serious physical and psychological abuse and neglect as a child" had on the defendant. *Id.* at 876 (internal quotation marks omitted). Similarly, Caro's counsel failed to present testimony which would have imparted upon the jury the detrimental impact that child abuse had on Caro's brain.

■ Moreover, counsel's failure to investigate or present evidence of Caro's brain damage was not strategic. This is not, thus, a case in which we may excuse counsel's failure to reasonably investigate or present evidence as a matter of tactical decisionmaking. *See, e.g., Bonin,* 59 F.3d at 834. Caro's trial counsel has filed a declaration conceding that he had *no* strategic reason for failing to investigate the effects that Caro's exposure to neurotoxicants and his personal background had on his brain. Accordingly, he has failed to adequately justify his reasons for not conducting a reasonable investigation and, therefore, rendered deficient performance.

The State urges us not to find deficient performance for two reasons: first, it argues that counsel did conduct a reasonable investigation into Caro's possible brain damage. In the alternative, it argues that counsel's failure to investigate was not unreasonable due to the paucity of literature regarding the link between exposure and brain damage at the time of Caro's trial.

First, it contends that counsel did, in fact, launch an investigation into the chemical poisoning of Caro's brain by ordering a blood test but desisted after the test results were negative. Thus, the State argues, counsel fulfilled his duty to conduct a reasonable investigation into Caro's possible brain damage.

This contention is unpersuasive. First and most notably, the blood test taken by counsel *did* indicate that Caro had been exposed to a fungicide. Dr. Ecobichon has asserted that this fact alone should have put counsel on notice that further investigation was necessary. Nonetheless, assuming *arguendo* that the only blood tests ordered by counsel came back negative for presence of pesticides, Caro's extraordinary history of exposure should have

prompted counsel to ask an expert about the risks of Caro's chronic exposure. A reasonably competent attorney would have known that a blood test would not have told the whole story; it was capable only of showing that certain chemicals indicative of pesticide exposure were in Caro's bloodstream at that moment in time. It would certainly not reveal the entirety of the cumulative effect that a lifetime of exposure to neurotoxicants and abuse would have on Caro's neurological system.

██ The State also contends that we cannot find deficient performance because the medical community was not yet aware of the effects of neurotoxicants on one's neurological system at the time of Caro's trial. If true, this fact would preclude a finding of deficient performance because the reasonableness of counsel's performance must be evaluated from his perspective at the time of the trial, not in hindsight. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. 2052.

However, the State is mistaken—the dangers of pesticides were known in 1980–1981. Each of the expert witnesses testified at the evidentiary hearing that the literature and data then available would have led him to conclude that Caro suffered brain damage as a result of his exposure to neurotoxicants, childhood injuries and abuse, or a combination thereof.

Dr. Ecobichon testified that, as early as the 1950's, studies had specifically linked exposure to pesticides with aggressive behavior and that "any competent toxicologist or neurologist who was interested in this area" would have been aware of data sufficient to diagnose Caro's brain damage. Dr. Bear testified that the link between cholinesterase inhibitors and violence became known as early as 1960, and between cholinesterase inhibitors and brain damage in the early 1970's. By the early 1970's, well-known studies had documented long-

term effects of exposure. He also testified that, by 1980 or 1981, a psychiatrist should have known about the studies linking behavioral disorders to exposure to cholinesterase inhibitors. And, although only some of the tests used to test Caro were available at the time of his trial, Dr. Pincus testified that the "most important tool"— the gathering of the patient's history from his family and friends—existed then. Because counsel failed either to conduct a reasonable investigation into the effects of Caro's exposure to neurotoxicants and his personal background on his brain or to provide a strategic or tactical justification therefor, we hold that his performance was constitutionally deficient.

## 2. Prejudice

██ A finding of deficient performance does not end our inquiry, however. We must also find that Caro was prejudiced by his attorney's incompetence. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. To show prejudice under *Strickland,* the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

██ In a challenge to a death sentence, the question presented is "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. 2052. This inquiry thus compels us to couple the omitted evidence with the mitigating evidence presented at trial and reweigh it against the aggravating evidence to determine whether the omitted evidence "might well

have influenced the jury's appraisal of . . . [the defendant's] moral culpability." *Williams,* 529 U.S. at 397–98, 120 S.Ct. 1495.

█ We have held that "all relevant mitigating information [must] be unearthed for consideration at the capital sentencing phase." *Caro,* 165 F.3d at 1227. This is critical because: "The determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts. The statutory factors give the jury broad latitude to consider amorphous human factors, to weigh the worth of one's life against his culpability." *Id.* (quoting *Hendricks,* 70 F.3d at 1044); *cf. Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 1920, 150 L.Ed.2d 9 (2001) ("[T]he jury [must] be able to consider and *give effect to* [a defendant's mitigating] evidence in imposing sentence" so "that we can be sure that the jury has treated the defendant as a uniquely individual human bein[g] and has made a reliable determination that death is the appropriate sentence.") (emphasis in original) (internal quotations omitted).

█ The District Court concluded that Caro suffered brain damage as a result of his acute and chronic exposure to neurotoxicants and his personal background. It is incumbent upon us to find that this fact was relevant mitigating information and should have been explained to and considered by the sentencing jury. The omission of this evidence renders Caro's death sentence unreliable.

The State contends that Caro was not prejudiced by this omission because the aggravating evidence before the jury was "substantial." The factors in aggravation included evidence that Caro stalked Hatcher before killing him, lured Donner and Lucchesi to come near him so that he could shoot them at close range, attempted

an alibi, had previously kidnaped and sexually assaulted other victims, and had made two escape attempts.

The State's argument does not dissuade us from our conclusion. We recently held that "[e]ven in the face of this strong aggravating evidence," a death sentence is rendered unreliable "if we cannot conclude with confidence that the jury would unanimously have sentenced . . . [the defendant] to death if . . . [counsel] had presented and explained all of the available mitigating evidence." *Mayfield,* 270 F.3d at 929 (citing *Williams,* 529 U.S. at 368–69, 399, 120 S.Ct. 1495).

It is significant, in considering the impact of the omitted evidence on the reliability of Caro's sentence, that the evidence presented by the defense as mitigation consisted primarily of lay background and character evidence. The only expert testimony presented relating to Caro's mental health did not shed light on his brain damage.

The first of the two experts presented at trial was Dr. Errol Leifer, a psychologist, who was unfamiliar with defendant's background and who, consequently, did not provide much in the way of compelling mitigation evidence. He surmised that Caro "was of superior intelligence but that he seemed periodically to lapse into a lower level of functioning in which he appeared to lose his grip on reality and to indulge in hostile and aggressive thoughts." This did not explain Caro's behavior and tended, rather, to paint him as a violent psychopath.

Defense also presented the testimony of Lynn Woodward, a social worker, who testified that Caro had suffered abuse, and as a result, "had a lot of suppressed rage and . . . that his bottled emotions could conceivably manifest themselves in periods of explosive, uncontrolled aggression." She

also opined that Caro probably killed the two teenagers because his girlfriend had recently left him and he became enraged "at seeing what appeared to be a happy couple sharing something he felt he could never have." While this testimony might have shed some compassionate light on Caro's frame of mind, it certainly did not reduce his moral culpability for his own lack of control over his emotions.

Furthermore, the evidence that was omitted is compelling. The jury was not afforded the benefit of expert testimony explaining the effects that Caro's *physiological* defects would have on his behavior, such as causing him to have "impulse discontrol" and irrational aggressiveness. By explaining that his behavior was physically compelled, not premeditated, or even due to a lack of emotional control, his moral culpability would have been reduced. *Cf. Williams*, 529 U.S. at 398, 120 S.Ct. 1495 (finding prejudice when the omitted evidence suggested that defendant's "violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation.").

This omission becomes even more compelling in light of the fact that "the evidence [of premeditation] was not particularly strong" in the prosecution's case against Caro. *Caro*, 251 Cal.Rptr. 757, 761 P.2d at 689. This fact is significant because a "conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052.

More than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system. 4 WILLIAM BLACKSTONE, COMMENTARIES *24–*25 ("[I]diots and lunatics are not chargeable for their own acts, if committed when under these incapacities: no, not even for treason itself.... [A] total idiocy, or absolute insanity, excuses from the guilt, and of course from the punishment, of any criminal action committed under such deprivation of the senses ....") (*quoted in Penry v. Lynaugh*, 492 U.S. 302, 331, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)). We query whether the jury would have wavered on sentencing Caro to death if it had known that, on the night of August 20, 1980, a mental defect might have caused him to suddenly lash out uncontrollably. We will never know for certain, but fortunately we need not resort to telepathy. It is sufficient that we are not confident the jury's selection of sentences would have been the same.

Because it has been established that Caro suffers from brain damage, the delicate balance between his moral culpability and the value of his life would certainly teeter toward life. Therefore, we find that counsel's errors prejudiced Caro by rendering the results of his penalty phase trial unreliable.

## III. CONCLUSION

Considering the testimony presented at the evidentiary hearing, the District Court was not clearly erroneous in finding that Caro suffered from brain damage as a result of his exposure to neurotoxicants and his personal background. Furthermore, considering all the facts of the case, Caro is entitled to relief on his ineffective assistance of counsel claim. For the foregoing reasons, we affirm the District Court's grant of relief.

AFFIRMED AND REMANDED.

KLEINFELD, Circuit Judge, dissenting.

I dissent. The district court did not err in this case. But we did.

The opinion the majority issued the last time this case was heard on appeal [1] limited the evidentiary hearing to this question: "whether [Caro] suffered brain damage as a result of his exposure to neurotoxicants and his personal background." That was all the district court was mandated to do, and that is what it did. The state's attorney called no witnesses on the brain damage issue, the defendant called several, and the district court went with the evidence before it.

The problem in the case came at the earlier stage, when we formulated that outlandish mandate. It was as though the majority in this habeas case was trying the case, instead of the jury that heard it twenty years ago. The question before us was not (or at least should not have been) whether Caro was brain damaged. The only legitimate question before us was whether Caro's lawyer rendered ineffective assistance of counsel.

The majority, in its first opinion, failed to approach that question seriously in light of the controlling precedents. I explained why in my previous dissent.[2] Basically, the majority said in that opinion that Caro's lawyer fell beneath the minimal standards of criminal defense attorneys by not discovering and proving that pesticides damaged Caro's brain when he was a child. I explained in my dissent that (1) Caro's lawyer consulted two psychiatrists, a clinical psychologist, and a licensed clinical social worker, to get whatever mitigating evidence they could come up with regarding Caro's mental or emotional condition; (2) the lawyer presented all the beneficial evidence they could come up with; (3) it wasn't much, and these experts did not suggest to the lawyer that there was anyone or anything else that would generate more useful evidence; (4) the research on how pesticides cause brain damage was in large part published in the decades following Caro's trial, so it was a physical impossibility for an expert witness to have relied on it; [3] (5) it probably wouldn't have made any difference to Caro's death penalty even if his lawyer had somehow proved, before it was generally accepted in the medical literature, that Caro's childhood pesticide damage had caused brain damage, in view of his competent intellectual and social functioning in college and in the Marines, and his relentlessness and recidivism in his monstrous rapes and murders. As I also explained in my previous dissent, the majority decision did not follow this court's precedents and the mandate of the Supreme Court.[4]

Though the majority's decision purported to be that Caro's lawyer rendered ineffective assistance of counsel, it is more consistent with the proposition that if anyone can come up with anything that might have bolstered whatever case the defense had, during the decades following imposition of a death penalty, then the defendant is entitled to a new penalty trial. It is especially striking that at the core of the

---

1. *Caro v. Calderon,* 165 F.3d 1223 (9th Cir. 1999).

2. *Id.* at 1228–34 (Kleinfeld, J., dissenting).

3. The majority opinion states that at the evidentiary hearing the experts testified that research was available during the early eighties that should have put Caro's attorney on notice. In doing so, it ignores testimony indicating that most of the important research on the subject did not materialize until after

Caro's trial, and what was available was largely anecdotal.

4. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Babbitt v. Calderon,* 151 F.3d 1170 (9th Cir.1998); *Coleman v. Calderon,* 150 F.3d 1105 (9th Cir.), *rev'd on other grounds,* 525 U.S. 141, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998); *Williams v. Calderon,* 52 F.3d 1465 (9th Cir.1995), discussed at *Caro,* 165 F.3d at 1228–34.

habeas case is testimony by one of the psychiatrists that Caro's lawyer consulted that if he had it to do over again, knowing what he knows now, his view would have been different.[5] That may establish that he performed below the required standard of competence (or it may not—medical science advanced over the decades since the imposition of Caro's death penalty), but it does not even bear on the question whether *defense counsel* fell below the required standard of competence. This latter question, about defense counsel, is the only one we have authority to answer.

Generally the doctrine of law of the case requires us to stick with a decision we have made. There is an exception to that rule, however, where our previous decision was "clearly erroneous and would work a manifest injustice."[6] That exception applies. I dissent.

---

**5.** *Caro,* 165 F.3d at 1226.

**6.** *Leslie Salt Co. v. United States,* 55 F.3d 1388, 1393 (9th Cir.1995); *see also United States v. Garcia,* 77 F.3d 274, 276 (9th Cir. 1996) (applying the law of the case doctrine *sua sponte*).