THOMAS, Circuit Judge:
Michael Emerson Correll, an Arizona inmate sentenced to death, appeals the district court’s denial of his petition for a writ of habeas corpus following our remand for an evidentiary hearing. We reverse.
I
The factual history of this case was detailed in our earlier opinion, Correll v. *1009 Stewart, 137 F.3d 1404, 1408-10 (9th Cir.1998) (“Correll I”). Correll was convicted by an Arizona jury in 1984 of first degree murder, attempted first degree murder, kidnapping, armed robbery, and first degree burglary for his role in a triple homicide. Id. at 1408. He was sentenced to death by the trial judge. Id. at 1410. His conviction was upheld by the Arizona Supreme Court. State v. Correll, 148 Ariz. 468, 715 P.2d 721 (1986). However, the Supreme Court modified his death sentence as to one of the victims and invalidated one aggravating factor. Id. at 730-31; 734-35.
In 1987, Correll timely filed a petition for post-conviction relief pursuant to Arizona Rule of Criminal Procedure 32. In this petition, Correll asserted multiple violations of his constitutional rights, including his right to the effective assistance of counsel during the guilt and penalty phases of his trial, his right to confrontation, and his right to reliability in capital sentencing. Correll later filed five supplements to his petition, adducing evidence of his mental impairment and his attorney’s ineffectiveness. The Arizona trial court summarily dismissed Correll’s petition and subsequently denied Correll’s motion for rehearing. The Arizona Supreme Court denied review without comment.
Correll subsequently filed a petition for writ of habeas corpus in federal district court under 28 U.S.C. § 2254. Correll alleged fifty-three constitutional violations at trial, at sentencing, and during the appellate process. The district court determined that twenty-six of Correll’s claims were procedurally barred, then granted summary judgment against Correll on his remaining constitutional claims.
On appeal, we affirmed all of the district court’s order except as to Correll’s contention that he was entitled to an evidentiary hearing on his claim of ineffective assistance of counsel at sentencing. Correll I, 137 F.3d at 1420. We remanded that issue to the district court with instructions to hold an evidentiary hearing on the claim. Id.
On remand, the district court conducted a nine day evidentiary hearing. Applying the standards set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny, the district court concluded that the performance of Correll’s attorney at sentencing was deficient, but that Correll had suffered no prejudice. Therefore, the district court granted judgment against Correll on his federal habeas corpus petition. This timely appeal followed.
Because Correll’s petition for a writ of habeas corpus was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (“AEDPA”), pre-AEDPA law governs our consideration of the merits of the claims. Lindh v. Murphy, 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); Jeffries v. Wood, 114 F.3d 1484, 1494 (9th Cir.1997) (en banc). Under pre-AEDPA law, we consider a claim alleging ineffective assistance of counsel as a mixed question of law and fact that we review de novo. Rios v. Rocha, 299 F.3d 796, 799 n. 4 (9th Cir.2002). We review the district court’s denial of Cor-rell’s habeas petition de novo and the district court’s factual findings for clear error. Id.
II
As the Supreme Court has long instructed, the Sixth Amendment right to counsel in a criminal trial includes “the right to the effective assistance of counsel.” McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). This right extends to “all critical stages of the criminal process,” Iowa v. *1010 Tovar, 541 U.S. 77, 80-81, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004), including capital sentencing, Silva v. Woodford, 279 F.3d 825, 836 (9th Cir.2002). “Because of the potential consequences of deficient performance during capital sentencing, we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase of trial.” Mak v. Blodgett, 970 F.2d 614, 619 (9th Cir.1992).
Under the familiar Strickland standard, to prevail on his claim of ineffective assistance of counsel during the penalty phase of his trial, Correll must demonstrate first that the performance of his counsel fell below an objective standard of reasonableness at sentencing, and second, that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” 466 U.S. at 694, 104 S.Ct. 2052. Under Strickland, we measure an attorney’s performance against an “objective standard of reasonableness,” measured “under prevailing professional norms.” Id. at 688, 104 S.Ct. 2052.
There are two aspects of Correll’s penalty phase defense at issue on this appeal: the investigation of possible defenses, and the presentation of the penalty phase defense.
A
Counsel has a duty at penalty phase “to conduct a thorough investigation of the defendant’s background.” Landrigan v. Schriro, 441 F.3d 638, 643 (9th Cir.2006) (en banc) (citing Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). “To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to ‘present[ ] and explain[ ] the significance of all the available [mitigating] evidence.’ ” Mayfield v. Wood-ford, 270 F.3d 915, 927 (9th Cir.2001) (en banc) (quoting Williams, 529 U.S. at 399, 120 S.Ct. 1495) (alterations in original). When it comes to the penalty phase of a capital trial, “[i]t is imperative that all relevant mitigating information be unearthed for consideration.” Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir.1999), as amended.
The ABA Standards for Criminal Justice provide guidance as to the obligations of criminal defense attorneys in conducting an investigation. Rompilla v. Beard, 545 U.S. 374, -, 125 S.Ct. 2456, 2466, 162 L.Ed.2d 360 (2005); Williams, 529 U.S. at 396, 120 S.Ct. 1495. The standards in effect at the time of Correll’s capital trial clearly described the criminal defense lawyer’s duty to investigate, providing specifically that:
It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused’s admissions or statements to the lawyer of facts constituting guilt or the accused’s stated desire to plead guilty.
ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.).
It is undisputed in this case that Correll’s attorney did little investigation of potential mitigating evidence for presentation at the penalty phase, although “[a]de-quate consultation between attorney and client is an essential element of competent representation of a criminal defendant.” United States v. Tucker, 716 F.2d 576, 581 (9th Cir.1983) (citation omitted). Correll alleges that defense counsel only met with him once, for five minutes between the *1011 trial and penalty phase. Correll I, 137 F.3d at 1412. Defense counsel testified at the evidentiary hearing that he met with Correll more than one time; however, it is apparent from the record that the consultation was not extensive.
Penalty phase investigations in capital cases should include inquiries into social background and evidence of family abuse, potential mental impairment, physical health history, and history of drug and alcohol abuse. Summerlin v. Schriro, 427 F.3d 623, 630 (9th Cir.2005) (en banc). An investigation should include examination of mental and physical health records, school records, and criminal records. Id. “Defense counsel should also personally review all evidence that the prosecution plans to introduce in the penalty phase proceedings, including the records pertaining to criminal history and prior convictions.” Id. (citing Rompilla, 125 S.Ct. at 2465).
Although he was aware that potential mitigating evidence existed, defense counsel did not explore any avenues that might lead to development of evidence. Indeed, in light of the abundance of classic mitigation evidence of which counsel was aware, his almost complete failure to investigate is startling. His attorney knew that, among other things, Correll came from a dysfunctional family, sustained a serious head injury, was committed to various psychiatric facilities, and that he was addicted to drugs; yet defense counsel did not obtain the records nor did he interview witnesses concerning these matters. Counsel did meet with the family members who would cooperate, but he admitted that he met only once with Correll’s father, sister, and brother, “around the kitchen table at the same time,” and probably spent “[a] couple hours” with them. Counsel did not obtain Correll’s school records, although he admitted that they may have contained mitigating evidence. He failed to obtain police reports on prior convictions and records regarding the time when Correll was in the custody of the California Youth Authority. Counsel did not obtain Correll’s medical records and made no inquiry about whether an X-ray or other diagnostic test was performed to determine whether Correll suffered any brain injury following an incident in which a wall fell on Correll’s head.
During the evidentiary hearing, counsel could not recall what efforts he made to gather Correll’s psychiatric records, although defense counsel did remember that he did not obtain records from Correll’s stays at various mental health centers.[1]
Defense counsel testified that the principal mitigation evidence he sought was information that would show Correll as a “good person” and one who had “done good deeds.” But even this limited investigation was unreasonably narrow.[2] For example, Reverend Curry, a chaplain with the California Youth Authority, was willing to testify on Correll’s behalf and assist in anyway he could; indeed his wife told defense counsel to contact the Reverend. No contact was ever made. Yet, Curry testified that he would have testified if contacted.[3]
*1012 Based on the foregoing, the district court was correct to conclude that defense counsel provided deficient representation when he failed to seek and obtain documents relating to Cornell's mental health and medical conditions. Defense counsel’s failure to investigate falls far short of any objectively reasonable standard against which we might measure attorney performance under the standards of the Sixth Amendment.
B
“There is no more important hearing in law or equity than the penalty phase of a capital trial.” Gerlaugh v. Stewart, 129 F.3d 1027, 1050 (9th Cir.1997) (Reinhardt, J., concurring and dissenting). At the penalty phase, a capital defendant has a “constitutionally protected right [] to provide the jury with ... mitigating evidence.” Williams, 529 U.S. at 393, 120 S.Ct. 1495. “Failure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel.” Bean v. Calderon, 163 F.3d 1073, 1079 (9th Cir.1998).
As anemic as the defense counsel’s investigation was, his presentation of mitigating evidence at the penalty phase was worse. Defense counsel put on no affirmative penalty phase defense whatsoever. He did not call a single witness to testify. He did not introduce any evidence. Rather, he elected to allow the judge to make a decision on whether to sentence Correll to death based solely on the state’s evidence and the pre-sentence report.
This was a critical error. “The failure to present mitigating evidence during the penalty phase of a capital case, where there are no tactical considerations involved, constitutes deficient perform-anee, since competent counsel would have made an effective case for mitigation.” Smith v. Stewart, 189 F.3d 1004, 1008-09 (9th Cir.1999).
The magnitude of this error becomes apparent when we consider the effect of the error under Arizona law. At the time of the penalty phase proceedings, Arizona law mandated the death penalty when the defendant had a qualifying prior conviction if there was no mitigating evidence. Ariz. Rev.Stat. § 13-703 (1984). One of the aggravating circumstances found by the sentencing judge was a previous violent felony. State v. Correll, 715 P.2d at 731. Thus, the failure to present any evidence in mitigation “all but assured the imposition of a death sentence under Arizona law.” Summerlin, 427 F.3d at 640; see also Evans v. Lewis, 855 F.2d 631, 637 (9th Cir.1988) (noting that in Arizona, once an aggravating circumstance like a prior aggravated felony was found, death was inevitable without mitigating evidence, and thus holding that the failure to pursue psychiatric evidence constituted prejudi-cially deficient performance).
In this case, the State argued five aggravating factors. Correll’s defense counsel disputed only a few of them. He disputed that the crimes were cruel, heinous, and depraved, and he argued that convictions for more than one homicide could not be used as an aggravating factor because the statute authorizing this factor was not in effect on the offense date. At the evi-dentiary hearing in this case, he conceded that he thought “it was a veritable certainty” that the court would find “at least two, and probably all five of [the] aggravating factors.” The court found four aggravating factors.
*1013 Defense counsel’s entire mitigation argument was contained in less than one page of a sentencing memorandum, which is reproduced in toto here:
A. Defendant was under the influence of alcohol and drugs at the time the offenses were committed. Guy Snelling stated in an interview with police officers on April 12, that there was alcohol on the breath of Defendant at the time the offenses were committed. It is obvious from this and the conduct of the perpetrators, that they were under the influence of alcohol or drugs or both at the time the offenses were committed.
B. Defendant was only a follower in the commission of the crimes. Guy Snell-ing stated in an interview with defense counsel on August 14, 1984, that it was clear that John Nabors was the leader of the two perpetrators and was making the decisions. This is further corroborated by the fact that it was John Na-bors who knew Guy Snelling would have illicit drugs and money and therefore, John Nabors must have done the planning of the robbery.
C. Prior to the robbery, there was no reason to believe that anyone would be present other than Guy Snelling, and therefore, there was no prior plan to kill Debra Rosen, Robin Cady or Shawn D’Brito.
D. Defendant has cooperated with the Adult Probation Office in the preparation of his presentence report.
E. Defendant’s age.
That, in total, was defense counsel’s mitigation case. When asked at the evidentia-ry hearing “what was your sentencing strategy,” trial counsel responded that it was basically, “hoping that Judge Howe liked Mr. Correll,” that “it was a drug ripoff that went bad and that Michael was under the influence,” and that “he wasn’t the leader in the crimes.”
Defense counsel did not put on any witnesses or evidence to support his mitigation case.[4] His sentencing memo does not even attempt to rebut three of the five aggravating factors urged by the State. In his oral presentation at sentencing, counsel mentioned the aggravating factors, but in form only, without any substantial legal position or evidentiary support. The entirety of his oral argument at the penalty phase consists of approximately 7 pages of transcript. The state trial court record states that “Defendant waives presentation of mitigating evidence.”
Given his virtual concession of most of the aggravating factors argued by the State, and waiver of the presentation of mitigation evidence, the outcome was obvious: imposition of the death penalty. The Arizona Supreme Court, in re-weighing the aggravating and mitigating factors, found no mitigating factors “sufficiently substantial to call for leniency.” State v. Correll, 715 P.2d at 735. The Court highlighted the lack of evidence presented in mitigation and noted that the “defendant has offered no evidence or expert testimony on which we could base a finding that he was unable to appreciate the wrongfulness of his conduct.” Id. The Court was particularly dismissive of his attempt to count cooperation in the pre-sentence investigation as a mitigating factor, noting “[i]t is in defendant’s interest to cooperate at sentencing; defendant should not be rewarded for self-serving acts.” Id.
*1014 As Correll demonstrated at his eviden-tiary hearing, there was a substantial amount of mitigation evidence available for presentation at the penalty phase. Correll had endured an abusive childhood. His mother was a Jehovah’s Witness, whose commitment to her church came before her commitment to her family. She spent most of her time with the church, often neglecting her six children’s basic needs. The children were required to attend adult bible study class with her three nights a week, for three hours per night. If they misbehaved or indicated that they were confused or did not understand the religious doctrine, they were punished. Cor-rell’s father was largely absent but sometimes aided his wife in physically punishing their children. There was evidence of incest in the family.
When Correll was seven, a brick wall collapsed on his head. Although he was unconscious for some time after the accident, his parents did not seek medical treatment until' several days later when he was still not back to normal. Several experts’ testified that this type of accident and the symptoms Correll exhibited then and now indicate a high likelihood of brain impairment'.
Against this backdrop, Correll began experimenting with alcohol and drugs around age ten. He was using marijuana, LSD, and amphetamines regularly by age twelve, behavior that can be characterized as self-medication for the everyday trauma of his life, and the mental health diagnoses he later received when he became a ward of the state.
It is notable that each of the six Correll children report that they had or have had substance abuse problems beginning in childhood or adolescence. Further, at least five of the six children spent time in juvenile correctional facilities, and all four of the boys in the family have spent time in adult correctional facilities.
In response to Correll’s obvious substance abuse problems, his parents intervened with beatings and threats of kicking him out of the house. Further, the staté failed to recommend drug or alcohol treatment despite Correll’s frequent contact with the juvenile authorities.
After Correll was shot in the arm at age 14, the hospital asked his parents to let him come home. They allowed him to recuperate at home for three or four days before asking the state to sever their parental rights. At that time, they cut off all communication with their son and considered him dead as required by their church’s teachings.
Correll became a ward of the state at age 14 and spent his teenage years in various state institutions described as “gladiator schools,” which were characterized as cruel and inhumane, even by those who worked there. He was placed in programs for low-performing students, which were, referenced as “dummy shacks.” Within months of becoming a ward of the state, 14 year-old Correll became addicted to heroin.
Correll was committed to psychiatric institutions at least twice during his teen years and was described at age 16 as “severely psychologically impaired.” He was treated with a tranquilizer/anti-psychotic drug while institutionalized, and attempted suicide on two occasions. However, there is no evidence that Correll continued to receive treatment after these stays.
Methamphetamine eventually became Correll’s drug of choice, which he used whenever he could. Correll offered expert testimony during the evidentiary hearing of the effect of high methamphetamine use, including brain damage, blackouts, and methamphetamine-induced psychosis, all of which may be compounded by sleep deprivation.
*1015 At the time of the murders, Correll was injecting a quarter gram to a gram of methamphetamine in one shot, and injecting three to four shots a day. According to expert testimony at the evidentiary hearing, Correll was in the top 1% of methamphetamine users in terms of quantity. During the period of time in which the crimes were committed, Correll’s typical pattern was to go seven to ten days without sleep, followed by one to two days of continuous sleep. He was observed injecting methamphetamine shortly before the crimes were committed. Expert testimony indicated that he was likely having impulse control problems, judgment impairment, and aggressiveness at the time of the crime, and may have been experiencing drug-induced paranoia.
In sum, there was a substantial amount of mitigating evidence available[5] that is clearly sufficient to establish prejudice under the Supreme Court’s standard in Wiggins, 539 U.S. at 534-38, 123 S.Ct. 2527. Counsel’s failure to present a mitigation case constitutes constitutionally ineffective assistance of counsel.
C
The State contends that the failure to put on penalty phase evidence was a strategic choice, protected under Strickland. To be sure, under Strickland, we must defer to trial counsel’s strategic decisions. “A reasonable tactical choice based on an adequate inquiry is immune from attack under Strickland.” Gerlaugh, 129 F.3d at 1033. However, to be considered a constitutionally adequate strategic choice, the decision must have been made after counsel has conducted “reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary.” Strickland, 466 U.S. at 691, 104 S.Ct. 2052. In addition, “[e]ven if [a] decision could be considered one of strategy, thát does not render it immune from attack — it must be a reasonable strategy.” Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir.1997) (emphasis in original). Defense counsel both failed to investigate potential mitigation evidence sufficiently to make an informed strategic decision and, when considered objectively, his strategy cannot be considered reasonable.
1
A decision by counáel not to present mitigating evidence' cannot be excused as a strategic decision unless it is supported by reasonable investigations. See Williams, 529 U.S. at 394, 120 S.Ct. 1495 (recognizing a constitutional right to present mitigating evidence to the jury); Silva, 279 F.3d at 843 (recognizing “the breadth of a criminal defendant’s constitutional protection against his attorney’s failure to investigate mitigating evidence when defending his client against a capital sentence”). In Wiggins, the Supreme Court held that the traditional deference owed to the strategic judgments of counsel is not justified where there was not an adequate investigation “supporting those judgments.” 539 U.S. at 521, 123 S.Ct. 2527.
Here, as we have discussed, defense counsel failed to make a reasonable investigation into potential mitigating evidence. Therefore, his decision not to put on a mitigation case cannot be considered to be the product of a strategic choice. An uninformed strategy is not a reasoned strategy. It is, in fact, no strate *1016 gy at all. Cf. Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052 (holding that “strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation”).
In Silva, for example, we held that in the absence of diligent investigation, counsel cannot make a reasoned tactical decision regarding whether or not to present mitigating evidence. 279 F.3d at 846-47. Indeed, we determined that even if a client forecloses certain types of mitigation evidence, “it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of [mitigating evidence].” Id.
Here, an abundance of classic mitigation evidence existed. However, counsel failed to investigate these potential avenues, and was therefore unable to make an informed decision as to whether to present the evidence. His choice not to present mitigation evidence, therefore, cannot be justified as strategic.
2
To the extent there was any strategy involved in the penalty phase presentation, it cannot be considered a reasonable strategy by any objective measure.
Defense counsel chose to rely on the pre-sentence report prepared by a state probation officer, despite characterizing it as “one-sided.” During his short sentencing argument, defense counsel criticized the author of the pre-sentence report for not talking to several people who could have provided mitigating statements. The irony, of course, is that defense counsel could have put into evidence during the penalty phase the very mitigating evidence that he felt was important for the probation officer to hear.
The report described the crimes as “particularly heinous” and speculated that “the murder scene in the desert must have been particularly gruesome.” The probation officer concluded that, given the circumstances of the crime, “[t]hey obviously planned the murders ahead of time and then calculatingly and unemotionally carried out their plans.” The pre-sentence report described Correll’s history as “a text book of psychopathology,” and “riddled with instances of violent behavior and armed aggression.” The probation officer determined that Correll “was not capable of functioning in society.” The report concluded with the observation that “[h]e is a threat, a menace, and in my opinion, the community at large should never again be subjected to the risk of recurrence of this type of behavior.” These statements are hardly the words of mitigation, and no competent capital defense counsel would have relied upon the report as providing mitigation evidence, much less the sole source of mitigation evidence.
Defense counsel testified at the eviden-tiary hearing that he “was basically hoping [the judge] would think it was a one-time incident and want to give Mr. Correll a break and find a mitigating factor.” However, the pre-sentence report contained explicit references to an extensive criminal history that belied this theory. Indeed, the page and a half of criminal convictions reported is longer than defense counsel’s entire mitigation presentation in his sentencing memorandum. It was not a reasonable strategy to rely on the pre-sen-tence report to prove that the crime was a “one-time incident,” when the entire report drew the opposite conclusion. Further, when examined at the evidentiary hearing, defense counsel was forced to admit that portraying the crime as a one-time drug ripoff gone bad was not something that would constitute a mitigating factor.
During the evidentiary hearing, defense counsel revealed a fundamental misconcep *1017 tion of mitigation evidence. He referred to the sentencing hearing as “a dog and pony show” and “so much smoke.” He said he felt that the judge would not have been receptive to mitigation evidence that was “touchy-feelly [sic] fuzzy-headed kind of stuff.” When asked about the classic mitigation evidence, such as potential brain injury,[6] a history of drug addiction, and abuse suffered as a child, he testified that he didn’t think of the evidence as favorable evidence. However, it is precisely this type of evidence that the Supreme Court has termed as “powerful.” Wiggins, 539 U.S. at 534, 123 S.Ct. 2527.
It appears clear from examination of his testimony that defense counsel was afraid of the sentencing judge. In fact, he forewent psychological testing because he felt that the judge would learn of it, and testified that he might have presented evidence of Correll’s history of drug addiction had he been before a different judge.[7] He believed that the judge would use mitigating evidence as an aggravating factor, in violation of the mandatory language of Ariz.Rev.Stat. § 13-703(E). However, this presumes that the judge would not follow the law — speculation that is not supported by the record.
Fear of a particular sentencing judge’s reaction also ignores the fact that, in capital cases, the Arizona Supreme Court conducts an independent review of the aggravating and mitigating factors and re-weighs them. See State v. Johnson, 147 Ariz. 395, 710 P.2d 1050, 1055 (1985) (“Whenever the trial court imposes the death sentence we must conduct an independent review of the facts that established the aggravating and mitigating circumstances in order to determine for ourselves if the latter outweigh the former and justify the sentence.”); see also State v. Richmond, 114 Ariz. 186, 560 P.2d 41, 51 (1976) (“[T]he gravity of the death penalty requires that we painstakingly examine the record to determine whether it has been erroneously imposed.”). The Arizona Supreme Court also conducts a proportionality review. State v. Correll, 715 P.2d at 737-38. Therefore, even if defense counsel’s fears about the judge were legitimate, there is no strategic excuse for failing to put on evidence in support of statutory mitigating factors that the Arizona Supreme Court could have considered in its independent re-weighing of aggravating and mitigating factors.
In short, to the extent that defense counsel had a strategy at all, it cannot be *1018 considered an objectively reasonable strategy.
3
Counsel’s ineffective assistance at sentencing cannot be excused as strategic. He failed to conduct a sufficient investigation to be able to make an informed judgment. To the extent his decisions reflected any tactical considerations, his approach of not putting on a mitigation case cannot be considered an objectively reasonable strategy, even when viewed under the highly deferential Strickland standard.
Ill
It is not enough for Correll to establish that his counsel’s performance at sentencing fell below an objective standard of reasonableness at sentencing. He must also “show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to “undermine confidence in the outcome.” Id.
In considering this question, we have recognized that deficient performance and prejudice questions may be closely related. See Summerlin, 427 F.3d at 643 (“[W]e conclude that the failure of trial counsel to investigate, develop, and present mitigating evidence at the penalty phase hearing has undermined our confidence in the sentence of death imposed by the trial judge.”); Smith, 189 F.3d at 1011 (“Because of [counsel’s] failure to provide competent representation, our confidence in the outcome of Smith’s sentencing has been undermined.”). In establishing prejudice under Strickland, it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. Williams, 529 U.S. at 398, 120 S.Ct. 1495. Accordingly, even where the facts discovered on habeas review do not rise to the level of statutory mitigation, we have held that a reasonable probability existed that this information could have affected the sentence. Smith, 140 F.3d at 1270; see also Rompilla, 125 S.Ct. at 2469 (“although we suppose that [the sentencer] could have heard it all and still have decided on the death penalty, that is not the test”).
Here, as we have discussed, there was a substantial amount of mitigating evidence that could have been presented, but was not. As the Supreme Court noted, “[h]ad the jury been able to place petitioner’s excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.” Wiggins, 539 U.S. at 537, 123 S.Ct. 2527. The failure to present mitigating evidence was particularly damaging under Arizona law that existed at the time, which virtually guaranteed the imposition of the death penalty based on Correll’s prior qualifying conviction.
The dissent argues that Correll was not prejudiced by the failure to investigate and present mitigation evidence and argument, because the presentation of such evidence and argument “would have enabled the prosecution to present very damaging rebuttal evidence.” However, a significant portion of that damaging rebuttal evidence was already available through the pre-sen-tence report. These facts could provide the basis for either the dehumanization of Correll, or mitigation provided the proper context.[8]
*1019 Correll was constitutionally entitled to the presentation of a mitigation defense. He did not receive one, although substantial mitigation evidence existed. Most importantly, because Arizona law required the imposition of a death sentence if aggravating factors were proven and no mitigating factors presented, the failure to present any mitigation defense constituted ineffective assistance of counsel under the standards set forth in Strickland. The fear of a trial judge cannot be considered strategic justification for forgoing the presentation of a mitigation defense, particularly given that (1) Arizona law required imposition of the death penalty when no mitigating factors were found, and (1) the Arizona Supreme Court was required to re-weigh the aggravating and mitigating factors.
We conclude that Correll is entitled to relief in the form of a new penalty phase trial. We reverse the judgment of the district court and remand with instructions to issue a writ of habeas corpus.
REVERSED.

. As the district court found, some of these records were destroyed between the time of the trial and the time of the habeas investigation.

. Further, such a limitation on the scope of the mitigation investigation was unreasonable given that it was unlikely that the testimony would have been sufficient to "humanize[] him during the time frame of the murder conspiracy at issue.” Allen v. Woodford, 366 F.3d 823, 851 (9th Cir.2004). Rather, the most likely type of evidence available was the type that portrays defendant as a "person whose moral sense was warped by abuse, drugs, [or] mental incapacity.” Id.

.Rev. Curry was asked specifically at the evidentiary hearing "if Mr. Collins had succeeded in getting ahold of you, would you *1012 have come to testify on Mike CorreU's behalf?” He responded “Yes, sir, I would have.” Later in the hearing, the question was posed again, "Had you been asked by Steve Collins, you would have unhesitatingly come to help Mike at his capital sentencing, would you not?” Rev. Curry answered, "Yes, sir.”

. As opposed to the dissent’s characterization of counsel "repeatedly dr[awing] the sentencing judge’s attention” to the likelihood that Correll was under the influence of drugs and alcohol at the time of the crime, there is but a single mention of drugs and alcohol in the brief sentencing memorandum and a single reiteration of that point at the sentencing hearing.

. The government argues that much of this evidence was already before the sentencing court in the pre-sentence report. While the bare facts of Correll’s troubled past were indeed presented to the court, without further investigation and presentation of contextual evidence and argument, such facts served only to demonize Correll rather than to mitigate the appropriateness of imposing the death penalty for his actions.

. As the district court noted, the Arizona Courts place significant weight on brain injuries as mitigating evidence. Similarly, "[w]e have repeatedly held that counsel may render ineffective assistance if he is on notice that his client may be mentally impaired, yet fails to investigate his client’s mental condition as a mitigating factor in a penalty phase hearing.” Caro v. Woodford, 280 F.3d 1247, 1254 (9th Cir.2002) (internal quotations omitted).

. The dissent characterizes this decision not to present psychological evidence as strategic because it would "make it easier for the judge to sentence Correll to death because it would cause him to view Correll as permanently damaged psychologically.” However, counsel’s failure to investigate Correll's psychological history for fear of the trial judge cannot be termed "strategic.” Counsel worried that the trial judge would presume that any psychological evaluation portrayed Correll in a negative light if he granted a contact visit order for such an evaluation and the results were never submitted to the court. This fear presumes that the trial judge would act inappropriately by considering evidence outside of the record in making his sentencing decision and fails to recognize the importance of creating a record for review, even if the trial judge likely would be unsympathetic. Psychological injury is the type of evidence the Supreme Court has viewed as classic mitigating evidence. Wiggins, 539 U.S. at 534, 123 S.Ct. 2527.

. That some of the defense witnesses at sentencing might have presented inculpatory testimony is not particularly significant, given that counsel had abandoned at sentencing any claims of actual innocence or misidentification.